**UNITED STATES of America**

v.

**H. L. MOORE DRUG EXCHANGE, INC.,**
**Hyman L. Moore,**

**Crim. No. 11308.**

United States District Court
D. Connecticut.

March 12, 1965.

Jon O. Newman, U. S. Atty., Hartford, Conn., argued by Howard Moskof, U. S. Atty., New Haven, Conn., for plaintiff.

Schatz, Weinstein & Seltzer, argued by Edward Seltzer, Hartford, Conn., for defendants.

BLUMENFELD, District Judge.

This is a motion to dismiss an information. Rule 12(b) (2), Fed.R.Crim.P.

H. L. Moore Drug Exchange, Inc., a Connecticut corporation engaged in the sale and distribution of drugs at wholesale to retailers, and Hyman L. Moore are charged with 14 separate violations of the Federal Food, Drug, and Cosmetic Act, Ch. 675, 52 Stat. 1040 (1938), codified as 21 U.S.C. §§ 301–392. The odd numbered counts charge them with introducing adulterated Dexedrine Sulfate Spansule capsules into interstate commerce on seven separate dates, and the

even numbered counts allege that these were in bottles bearing labels which misbranded the capsules.[1] All counts are charged to be in violation of § 331:

"The following acts and the causing thereof are prohibited:

"(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."

The defendants assert, and the government concedes, that the capsules which the defendants "introduced" into interstate commerce had been earlier received in interstate commerce by the H. L. Moore Drug Exchange, Inc. from Drug Purchase, Inc. and Drug Plan, Inc. of New York City. Taking this fact into account, the defendants claim that, since the offenses allegedly committed by them had their inception in the receipt of the capsules, they may only be charged under § 331(c), which prohibits:

"The receipt in interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise."

and not as the government has done with a truncated portion of the entire transaction. But § 331(a) and 331(c) define separate crimes, in separate subdivisions, made up of differing components. The absurdity of the claim that they should be merged is revealed by the conceded facts, which are that two shipments of the offensive articles were received in interstate commerce and seven portions of those were subsequently introduced into interstate commerce by the defendants' shipments to others. See Morgan v. Devine, 237 U.S. 632, 35 S.Ct. 712, 59 L.Ed. 1153 (1915); Blockburger v. United States, supra, 284 U.S. 299, 52 S.Ct. 180. The defendants' contention that the violations of § 331(a) must be merged into or fused with those which could have been charged under § 331(c) is

without merit, as is their argument that they could not be charged solely with the "introduction" of adulterated goods into interstate commerce.

However, their principal argument is reached at this stage of the proceedings by realistically treating the conceded facts as a bill of particulars. Cf. United States v. Philippe, 173 F.Supp. 582 (S.D.N.Y.1959), overruled on other grounds United States v. McCue, 301 F. 2d 452, 456 (2d Cir.), cert. denied, 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962); United States v. McKay, 45 F. Supp. 1001 (E.D.Mich.1942). The heart of the defendants' contention is that, regardless of whether they are charged under § 331(a) or § 331(c), they are immunized from criminal responsibility by the exception found in § 333(c) (1) of the penalty provisions of § 333, which are applicable to violations of § 331. But see United States v. American Stores Co., 183 F.Supp. 852, 855 (D.Md.1960). The pertinent portions of § 333 are found in subsection (c) (1) and (2):

"No person shall be subject to the penalties of subsection (a) of this section, (1) for having received in interstate commerce any article and delivered it or proffered delivery of it, if such delivery or proffer was made in good faith, unless he refuses to furnish on request of an officer or employee duly designated by the Secretary the name and address of the person from whom he purchased or received such article and copies of all documents, if any there be, pertaining to the delivery of the article to him; or (2) for having violated section 331(a) or (d) of this title, if he establishes a guaranty or undertaking signed by, and containing the name and address of, the person residing in the United States from whom he received in good faith the article, to the effect, in case of an alleged violation of section 331(a) of

---

1. The question of whether each pair of counts is a duplicitous description of the same offense. cf. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76

L.Ed. 306 (1932), an objection which would not support dismissal of all 14 counts, is not posed.

this title, that such article is not adulterated or misbranded, * *."

As explained in United States v. Dotterweich, 320 U.S. 277, at 279, 64 S.Ct. 134, at 136, 88 L.Ed. 48 (1943): "That section [§ 333] affords immunity from prosecution if certain conditions are satisfied."

The defendants argue that this differential attitude in favor of one who *receives* the offensive articles in interstate commerce and in good faith delivers them (§ 333(c) (1)) as against the one who first *introduces* them into interstate commerce (§ 333(c) (2)) was designed to protect an innocent re-shipper in their position.

█ It has long been recognized that the overall purpose of the original "Food and Drugs Act," Ch. 3915, 34 Stat. 768 (1906) was "to protect consumers against impure and adulterated foods and drugs, and also against the use of foods or drugs which do not show what they contain by the brands on the package." United States v. Mayfield, 177 F. 765, 766 (N.D.Ala.1910). And in United States v. Dotterweich, supra, 320 U.S. 277, at 282, 64 S.Ct. 134, at 137, the Supreme Court noted the continuity of that purpose in the Act of 1938:

"Nothing is clearer than that the later legislation was designed to enlarge and stiffen the penal net and not to narrow and loosen it. This purpose was unequivocally avowed by the two committees which reported the bills to the Congress. The House Committee reported that the Act 'seeks to set up effective provisions against abuses of consumer welfare growing out of inadequacies in the Food and Drugs Act of June 30, 1906.' (H.Rep.No.2139, 75th Cong., 3d Sess., p. 1.) And the Senate Committee explicitly pointed out that the new legislation 'must not weaken the existing laws,' but on the contrary 'it must strengthen and extend the law's protection of the consumer.' (S.Rep.No.152, 75th Cong., 1st Sess., p. 1.)"

The dominant importance of consumer protection is emphasized by this legislation which, after weighing "the possible injustice of subjecting an innocent seller to a penalty against the evil of exposing innocent purchasers to danger," United States v. Balint, 258 U.S. 250, 254, 42 S. Ct. 301, 303, 66 L.Ed. 604 (1922), "dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." United States v. Dotterweich, supra, 320 U.S. at 281, 64 S.Ct. at 136.

It is against the background of those purposes that the considerations which underlie the less stringent liability-immunizing conditions specified in § 333(c) (1) which Congress adopted by the Act of 1938 must be examined. United States v. Dotterweich, supra, 320 U.S. at 283, 64 S.Ct. 134.

The defendants rely heavily upon United States v. Levine, CCH Fed. Food, Drug & Cosmetic Rep., p. 7710 (E.D.Pa. 1948). That was a case in which the significant facts are indistinguishable from those present here. There, the defendant received goods from out of state, labelled the original packages, and then shipped them to retailers throughout the country. In holding that it was "unnecessary to determine whether or not the defendant falls within the scope of the exemption contained in subsection (2) [of § 333(c)] relating to guaranty for the reason that it is satisfied * * * that the defendant has complied with the conditions set forth in subsection (1) [of § 333(c)] and is therefore exempt from the penalties provided for in the Act" the court said at 7712:

"Our conclusion is substantiated by a consideration of the purpose of the exemption found in subsection (1). It is clear that it was designed to protect innocent dealers, such as the defendant, who receive goods shipped in interstate commerce. U. S. v. Parfait Powder [Puff] Company, 163 F.

(2d) 1008. Thus, in Senate Report No. 493, 73rd Congress, 2nd Session, accompanying S. 2800, the Senate Committee reported as follows:

" 'The existing law provides for a guaranty whereby a dealer who buys on faith may be protected from liability under the law. This provision has safeguarded innocent dealers and has been extremely useful in fixing responsibility on guilty shippers. It would be continued in effect by paragraph (e). The bill affords in this paragraph further protection to the innocent dealer who distributes goods he has received from interstate sources. If he has failed to secure a guaranty he can escape penalties by furnishing the records in interstate shipment, thus allowing the prosecution to lie solely against the guilty shipper.'

"It is clear, we think, that the Act was intended to furnish protection to innocent receivers of goods shipped to them in interstate commerce in violation of the Act. The defendant in the instant case is such an innocent dealer and should be afforded the protection."

I respectfully decline to follow Levine. In view of the purpose of Congress to throw a wide net "to safeguard the consumer from the time the food is introduced into the channels of interstate commerce to the point that it is delivered to the ultimate consumer," United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 92, 84 S.Ct. 559, 563, 11 L.Ed.2d 536 (1964), one might wonder whom Congress meant by "the innocent dealer who distributes goods he has received from interstate sources" that was to be given "further protection." When Congress made its re-evaluation of the steps to be required of a "dealer" who wished to escape punishment, the "existing law," 34 Stat. 768 (1906), at 771, § 9, provided:

"[N]o *dealer* shall be prosecuted under the provisions of this Act when he can establish a guaranty signed by the *wholesaler, jobber, manufacturer, or other party* residing in the United States, from whom he purchases such articles, to the effect that the same is not adulterated or misbranded within the meaning of this Act, designating it. Said guaranty, to afford protection, shall contain the name and address of the party or parties making the sale of such articles to such dealer, and in such case said party or parties shall be amenable to the prosecutions, fines, and other penalties which would attach, in due course, to the dealer under the provisions of this Act." (Emphasis added)

This identification of a dealer was not a description more or less accidental. It is plain that the "dealer" in whose favor Congress was making a discrimination was set apart in a different class from all others in the hierachy of those engaged in the distribution of adulterated or misbranded drugs. These defendants are not dealers; rather, they are wholesalers.

The establishment of the guaranty described in § 333(c) (2) is not to be equated with furnishing the name and address of the person from whom the offending article was received on the ground that either will assist the government to find the person who first introduced the offending article into interstate commerce. Cf. United States v. Mayfield, supra, 177 F. at 768–769. If the purpose of this strict liability statute is to put "the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger," United States v. Dotterweich, supra, 320 U.S. at 281, 64 S.Ct. at 136, in the interest of the larger good, it is not only important that the first violator shall be punished, but also all those in whose case it can be said that punishment would induce them to keep their suppliers and themselves up to the mark.

The defendants are not released from liability under the act by complying with the conditions of 21 U.S.C. § 333(c) (1).

There is no need to discuss the challenges addressed to the remaining counts of the information. These present questions of fact to be resolved at trial.

The motion to dismiss is denied.