CLARKSDALE RUBBER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 663–64. Filed December 8, 1965.

---

*James F. Kennedy, Jr.*, for the petitioner.
*Buckley D. Sowards*, for the respondent.

DAWSON, *Judge:* Respondent determined the following deficiencies in petitioner's income taxes:

| TYE Dec. 31— | Deficiency |
|---|---|
| 1958 | $104, 584. 25 |
| 1959 | 76, 461. 63 |
| 1960 | 8, 109. 18 |

Two issues raised in the notice of deficiency have been conceded by the parties. There remains for decision only the question as to whether petitioner is entitled to net operating loss carryover deductions claimed in its returns for the taxable years 1958 and 1959.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are so found.

Clarksdale Rubber Co. (hereafter called petitioner) was incorporated under the laws of the State of Mississippi on January 28, 1946, under the name of Dismuke Tire & Rubber Co., Inc. Petitioner filed its 1958 and 1960 Federal corporate income tax returns with the district director of internal revenue at Jackson, Miss. Petitioner filed its 1959 Federal corporate income tax return with the district director of internal revenue at Cleveland, Ohio.

From the time of its incorporation until sometime in May 1955, petitioner manufactured rubber products for the automotive industry, principally camelback (tread rubber) and tubes, and sold them under the following brand names: Premium Quality, Billups, Dismuke Five Star, Meridian, D & J, and Deluxe Double Blank. Its operations were profitable through the taxable year 1953. However, in 1954 petitioner began to encounter financial difficulties. Its working capital was almost completely exhausted and it could not pay its creditors. W. O. Dismuke (hereafter called Dismuke), petitioner's key officer, convinced its largest creditors to accept a delayed payment plan which temporarily relieved the situation. Petitioner was then placed in the hands of Stuart W. Cochran & Co., an industrial broker, for sale. In January 1955, petitioner experienced production troubles and began shipping defective products. When its customers refused to pay their accounts because of this, the payments to creditors were again delayed,

thus resulting in their refusal to supply petitioner with needed raw materials.

Petitioner suspended its manufacturing operations in March 1955 and leased its facilities to a subsidiary of the Mansfield Tire & Rubber Co. (hereafter called Mansfield) for a period of 90 days from May through July 1955. Mansfield retained most of petitioner's employees, adding only its own plant manager and superintendent in charge.

During the lease term, Mansfield and petitioner attempted to negotiate an agreement to extend Mansfield's control beyond the 90-day period. Ultimately Mansfield, believing it could not meet the terms of petitioner's principal shareholder Dismuke, closed the plant in late July 1955. Throughout this period petitioner had also been negotiating with other firms in the rubber industry, especially Cooper Tire & Rubber Co. (hereafter called Cooper), a Delaware corporation with its principal offices in Findlay, Ohio. Cooper had been engaged in the production and sale of rubber products for many years through its own facilities and that of its subsidiaries. It sought expansion into the Southern States because it had developed markets there and because that area supplies the raw materials necessary for the manufacture of rubber products. Cooper first became aware of petitioner in August 1954, when Dismuke advertised the petitioner with Cochran. In early August 1955, however, the officers of Cooper visited petitioner's plant site and made a hurried examination of petitioner's books and records. As a result, the plant reopened on August 8, 1955, under a temporary lease and a statement of intent whereby Cooper was to take possession and manage the operation at a rental of $300 a day pending the negotiation and execution of a formal lease and stock option agreement. Dismuke had offered to sell only petitioner's assets to Cooper, but Cooper rejected the offer because the assets were already encumbered by a mortgage indebtedness and Cooper did not want to expose itself to petitioner's liabilities.

Upon taking possession of the plant, Cooper ordered an audit which disclosed that petitioner was the defendant in two lawsuits and that Federal tax liens, totaling $90,567.91, had been filed in the Chancery Court of Coahoma County, Miss. Furthermore, there were $133,435.93 in outstanding accounts receivable. Of this total, $23,296.44 represented potential losses due to customer allegations of defective products, $41,928.28 represented receivables from corporations related to petitioner's owners, and an additional $51,138.38 (and substantially all of the merchandise inventory) was pledged to banks for loans. All of the fixed assets were pledged as security for a mortgage loan. Finally, current liabilities exceeded current assets by over 2 to 1.

About the same time the statement of intent with petitioner was signed, Cooper formed a new wholly owned Mississippi subsidiary, the Clarksdale Rubber Manufacturing Co. (hereafter called Clarksdale

Manufacturing), and on or about August 12, 1955, Cooper assigned its rights to lease the petitioner's facilities to this subsidiary. Clarksdale Manufacturing immediately entered into the manufacture of tubes and camelback, selling them under the brand names of Cooper and two of its subsidiaries, Grant Tire & Rubber and Fall Tire & Rubber. These names were used since petitioner's brand names had lost their retail position due to the defective materials produced by petitioner before its arrangement with Cooper.

When Cooper first assumed control of petitioner's manufacturing operations in August 1955, the same employees who had originally worked for the petitioner and then for Mansfield were brought back into the plant. The same operation, viz, the manufacture of tubes and camelback, was continued. Production procedures remained the same and the market area was left unchanged.

Clarksdale Manufacturing continued to operate petitioner's facilities throughout the remainder of 1955 under the letter of intent signed with Cooper on August 8, 1955, while Cooper's directors negotiated with Dismuke over the future of petitioner. In January 1956, negotiations broke down and Cooper's directors temporarily ceased operating petitioner's facilities, vacated the premises, and dismissed all the employees except Leland Gough, an accountant with the petitioner since 1951, who had subsequently worked as office manager for Mansfield and then Clarksdale Manufacturing. Cooper suspended operations to force Dismuke to terms. Negotiations continued throughout the first months of 1956. They ultimately resulted in the execution of a final agreement dated March 6, 1956, between Cooper, petitioner, and the petitioner's shareholders. Under the terms of this agreement Cooper (or its subsidiary) was to continue to lease petitioner's plant and facilities for a period of 3 years at a rental of $10,000 per month. Petitioner was also to be paid by Cooper (or its subsidiary) an additional rental equal to 25 percent of the net profit before taxes in excess of $120,000 a year derived from the production and sales of products from the petitioner's plant. The agreement contained a provision giving Cooper the right to terminate the lease for any reason at the end of the first 6 months and also provided Cooper with an option to purchase all of petitioner's outstanding stock for $100,000. After the execution of the agreement on March 6, 1956, Cooper immediately assigned its lease rights (but not the option to purchase stock) to Clarksdale Manufacturing.

After Clarksdale Manufacturing resumed manufacturing activities in March 1956, it put in its own management at the petitioner's plant but reemployed the other production employees that had worked there before. Clarksdale Manufacturing sold in the same market area as petitioner and to some of the same customers. There were no changes

made by Clarksdale Manufacturing in the type of product manufactured, although the quality improved.

Having transferred its manufacturing and sales activities to Clarksdale Manufacturing, petitioner began to cope with its financial difficulties. Petitioner worked out an arrangement with its supplier-creditors that resulted in a note being issued to them setting up a 3-year moratorium for payment. With its most pressing concern thus resolved, petitioner then turned to the settlement and collection of its accounts receivable. Because of the defective products petitioner had manufactured and sold before Cooper entered the picture, many of petitioner's customers withheld payment for the goods they received. Others demanded that petitioner pay them for the expenses incurred due to the defective products. Petitioner was thus forced to engage as both plaintiff and defendant in over a dozen lawsuits.

On November 29, 1956, petitioner secured a loan in the amount of $325,000 from the First National Bank of Jackson, Miss., and the Coahoma County Bank & Trust Co., Clarksdale, Miss., for the purpose of paying off existing indebtedness to the Reconstruction Finance Corporation, the U.S. Treasury (for delinquent tax liabilities), and certain other creditors. In order to help petitioner secure such a loan Cooper entered into an agreement with the petitioner dated November 29, 1956, promising the above-named banks that it would not alter, amend, or terminate the operating lease before its expiration without the consent of the banks. On the same day Cooper and the petitioner entered into another lease agreement with respect to the petitioner's plant and facilities for a period in addition to that covered by the agreement of March 6, 1956, so that the total lease period ran concurrently with the 5-year-term bank loan. Finally, petitioner made a written assignment of the rentals to be received under its leases with Cooper (together with its other rights as lessor) to the creditor banks and Cooper consented to this assignment. Pursuant to this agreement, petitioner appointed the Coahoma Bank & Trust Co., as trustee, to receive rentals under its leases with Cooper and to make designated disbursements.

At a meeting of Cooper's board of directors on December 18, 1956, it was decided to exercise the option to purchase all of petitioner's capital stock. This was done on December 28, 1956. Because of offsetting obligations owed petitioner by certain businesses controlled by Dismuke, the net cash amount paid by Cooper for the stock pursuant to the option agreement was $35,000.

On December 31, 1956, Cooper sold 15 percent of petitioner's stock to Frank M. Wiseley of Findlay, Ohio, for $15,000, subject to the right of Cooper to repurchase such shares within 1 year for $16,000 and within 2 years for $17,000. The sale to Wiseley was made upon the advice of Cooper's accountant that it would thereby avoid Cooper

having to reflect petitioner's heavy indebtedness and otherwise poor financial condition in a consolidated financial statement.

By the early part of 1958 most of petitioner's financial problems were solved and the 3-year note to its supplier-creditors was paid off. At a directors meeting of Cooper on March 29, 1958, it was decided to terminate the lease between petitioner and Clarksdale Manufacturing. In order to obtain the banks' consent to such termination, as required by Cooper's agreement of November 29, 1956, with the petitioner, the decision was made that Cooper would guarantee payment of the balance then owing on petitioner's $325,000 note. A letter agreement was concluded between Cooper and the creditor banks effectuating this decision.

On April 30, 1958, Cooper caused petitioner to terminate its lease with Clarksdale Manufacturing and the petitioner resumed the manufacturing operation itself, using the brand and trade names used by Clarksdale Manufacturing. On May 1, 1958, Clarksdale Manufacturing sold its remaining inventory to petitioner for $162,803.31, distributed its assets to Cooper, but did not dissolve. On or about the same date, petitioner's name was changed to the Clarksdale Rubber Co. Clarksdale Manufacturing, then a corporate shell, was renamed the Delta Rubber Manufacturing Co., which is presently inactive.

Cooper exercised its option to reacquire the outstanding minority interest in petitioner from Wiseley on December 31, 1958, and it has owned all of petitioner's stock since that date.

The losses incurred by petitioner during 1955 and 1956 created a net excess of liabilities over assets of $181,739. Such losses resulted from bad debt writeoffs, a devaluation of inventory, legal expenses of lawsuits, et cetera. In substance, such losses represented a backwash on the actual manufacturing operations conducted by the petitioner before Cooper became involved. Such losses were to some extent offset by the rentals received by the petitioner from Clarksdale Manufacturing during 1955 and 1956. During the taxable years 1958 through 1960 petitioner had substantial operating income from the manufacture and sale of tubes and camelback.

Petitioner had taxable income or loss (before adjustment for net operating loss carrybacks and carryforwards) for the taxable years 1952 through 1960 inclusive, as follows:

| Year | Income (or loss) |
| --- | --- |
| 1952 | $92, 731. 59 |
| 1953 | 10, 057. 67 |
| 1954 | (99, 399. 02) |
| 1955 | (273, 336. 17) |
| 1956 | (115, 056. 26) |
| 1957 | 26, 560. 10 |
| 1958 | 211, 700. 48 |
| 1959 | 248, 547. 48 |
| 1960 | 32, 679. 25 |

Clarksdale Manufacturing had taxable income or loss (before adjustment for net operating loss carryforwards or carrybacks) for the periods ended December 31 of each of the years 1955 through 1957 as follows:

| Year | Income (or loss) |
|---|---|
| 1955 | $28,720.83 |
| 1956 | (30,347.29) |
| 1957 | 91,860.73 |

Cooper acquired control of the petitioner for the principal purpose of increasing its profits through proper management of petitioner's facilities. Petitioner was not inactive from March 1955 through April 1958. It was constantly engaged throughout this period in the process of regaining its financial stability. Petitioner carried on the same trade or business after April 30, 1958, that it did prior to March 1955.

OPINION

Section 269(a) of the Internal Revenue Code of 1954 provides that if a corporation is acquired for *the principal purpose* of avoiding Federal income taxes, the deduction, credit, or other allowance giving rise to the possible tax avoidance will not be allowed.

Whether the principal purpose under section 269(a) is tax avoidance is a question of fact. *Elko Realty Co.*, 29 T.C. 1012 (1958), affirmed per curiam 260 F. 2d 949 (C.A. 3, 1958); *Frank Spingolo Warehouse Co.*, 37 T.C. 1 (1961).

Respondent contends in his brief that the facts of this case "show an overall pattern to obtain the benefit of petitioner's net operating losses." Respondent stresses the following points in support of his contention: Cooper had knowledge of petitioner's losses; Cooper purchased petitioner's stock with that knowledge; petitioner thereafter earned profits; and, since respondent's determination is presumptively correct, the burden is upon the petitioner to show that the determination is erroneous.

We conclude from the structure of his argument that respondent does not press too seriously this contention regarding the applicability of section 269(a) since it would require us to ignore the uncontroverted testimony of petitioner's witnesses, whom we have no reason to doubt. Cooper has continuously tried to expand its operations, especially in the Southern States, because that area provided the raw materials needed for production as well as an excellent market for the company's finished product. Acquisition of petitioner's stock rather than its assets was necessary because Cooper was encumbered with mortgage indebtedness, had very limited working capital, and was unable to raise enough money to buy petitioner's assets. Furthermore, the pur-

chase price ultimately paid by Cooper for petitioner's stock was not arrived at by taking the operating losses into consideration.[1]

The evidence introduced by petitioner is sufficient to carry its burden of proof on this issue, particularly in view of respondent's failure to counter it with any evidence indicating that tax avoidance was the principal purpose of the acquisition. On this record we are unable to leap from the *conditions* of 269(a), i.e., the existence of a possible tax benefit, knowledge on the part of the buyer, and subsequent purchase, to a *conclusion* that the principal purpose of purchase was tax avoidance. See *Baton Rouge Supply Co.*, 36 T.C. 1 (1961); *Berland's Inc. of South Bend*, 16 T.C. 182 (1951). Since the petitioner has established that other sound business reasons motivated the Cooper interests to purchase petitioner's stock, it is our conclusion that Cooper's principal purpose was the desire and need for expansion and not avoidance of Federal income taxes. Accordingly, we hold that section 269(a) is inapplicable.

But respondent does not rest his position solely on section 269(a). He next urges us to apply the rationale of *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382 (1957), where the Supreme Court said (p. 389):

The fact that section 129(a) [now section 269(a)] is inapplicable does not mean that petitioner is automatically entitled to a carryover. The availability of this privilege depends on the proper interpretation to be given to the carryover provisions.

In *Libson Shops*, a corporation resulting from the merger of 17 separately incorporated but commonly owned businesses (each of which had filed separate income tax returns) was not allowed to carry over and deduct the net operating losses of three of its constituent corporations from the postmerger income attributable to the others. The Supreme Court reached this conclusion because: "The income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses." Respondent argues that a "proper interpretation" of the "carryover provisions" under the *Libson Shops* rationale indicates that when petitioner resumed manufacturing activities in March 1958, it was not the same business which had incurred the losses and, therefore, should not be allowed to offset such losses against petitioner's post-March 1958 gains. We reject this argument for two reasons.

First, we think respondent's application of *Libson Shops* to the facts before us here represents an extension of that case beyond its

---

[1] Q. Were the expenses and the anticipated operating losses used in this way to arrive at a price of $108,000?

A. No, I wouldn't say so.

Q. Your answer was——

A. No, I wouldn't say that had anything to do with it. These owners had invested a certain amount of money and wanted a certain amount of money, and Cooper determined that $100,000 was a worthwhile speculation if we could control the corporation. We needed the facility very badly.

own established limits. As we said in *Humacid Co.*, 42 T.C. 894, 907 (1964) : "It seems to us that what the Supreme Court had in mind in *Libson Shops, Inc.* was something more in the nature of an economic concept prohibiting separate business units from combining so that profits from one separate enterprise might be offset against the losses of another." Here the manufacturing and sales operations were temporarily transferred out of petitioner's hands long enough for it to acquire financial and credit stability. As soon as this was accomplished, these operations were returned to the petitioner and it continued on as before. An examination of the cases following the *Libson Shops* doctrine shows that in each case two or more previously independent business endeavors were joined together, thus offsetting the gains of one against the losses of the other.[2] In some instances there was identity or similarity in the economic endeavors of each.[3] In others the business activities were widely different.[4] But, in each, separate businesses contributed the losses and gains. In the instant case the petitioner contributed both losses and gains, separated by a period of temporary manufacturing inactivity. We are not inclined to extend the factual conclusions reached in *Libson Shops* to cover the different facts before us in this case.

Moreover, the *Libson Shops* decision involved a taxable year under the Internal Revenue Code of 1939, which contained no statutory equivalent to the provisions of sections 381 or 382 of the 1954 Code.[5]

---

[2] In two cases substantially developed new business ventures (rather than legal entities) were added to the loss corporations, each markedly differing from the activities conducted by the loss corporation. We deem the slight factual distinction to be immaterial in the present analysis of *Libson's* applicability. See *Mill Ridge Coal Co.* v. *Patterson*, 264 F. 2d 713 (C.A. 5, 1959) ; *Arthur T. Beckett*, 41 T.C. 386 (1963), reversed sub nom. *Maxwell Hardware Co.*, 343 F. 2d 713 (C.A. 9, 1965).

[3] See *Old National Bank of Evansville* v. *Commissioner*, 256 F. 2d 639 (C.A. 7, 1958), modifying 28 T.C. 1075 (1957) ; *Julius Garfinckel & Co.*, 40 T.C. 870 (1963), affd. 335 F. 2d 744 (C.A. 2, 1964), certiorari denied 379 U.S. 962 (1965) ; *Federal Cement Tile Co.*, 40 T.C. 1028 (1963), affd. 338 F. 2d 691 (C.A. 7, 1964) ; *Allied Central Stores, Inc.*, 339 F. 2d 503 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; *Foremost Dairies, Inc.* v. *Tomlinson*, 341 F. 2d 580 (C.A. 5, 1965), affirming per curiam 239 F. Supp. 258 (M.D. Fla. 1963) ; *Dumont-Airplane & Marine Instruments, Inc.*, 28 T.C. 1308 (1957).

[4] See *Huyler's*, 38 T.C. 773, affd. 327 F. 2d 767 (C.A. 7, 1964) ; *J. G. Dudley Co.*, 36 T.C. 1122 (1961), affd. 298 F. 2d 750 (C.A. 4, 1962) ; *Commissioner* v. *Virginia Metal Products, Inc.*, 290 F. 2d 675 (C.A. 3, 1961), reversing 33 T.C. 788 (1960) ; *Norden-Ketay Corporation* v. *Commissioner*, 319 F. 2d 902 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court, certiorari denied 375 U.S. 953 (1963) ; *Irving-Kolmar Corporation*, 35 T.C. 712 (1961) ; *Long Corp.* v. *United States*, 156 Ct. Cl. 197, 298 F. 2d 450 (1962) ; *Seaboard Commercial Corporation*, 28 T.C. 1034 (1957) ; *Joseph Weidenhoff, Inc.*, 32 T.C. 1222 (1959) ; *Bookwalter* v. *Hutchens Metal Products, Inc.*, 281 F. 2d 174 (C.A. 8, 1960) ; *Phinney* v. *Houston Oil Field Material Co.*, 252 F. 2d 357 (C.A. 5, 1958) ; *Frelbro Corporation*, 36 T.C. 864 (1961), reversed on other grounds 315 F. 2d 784 (C.A. 2, 1963).

[5] SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS.

    (a) PURCHASE OF A CORPORATION AND CHANGE IN ITS TRADE OR BUSINESS.—

        (1) IN GENERAL.—If, at the end of a taxable year of a corporation—

           (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—

Section 1.382(a)–1, Income Tax Regs., provides for the disallowance of net operating loss carryovers if the loss corporation has a 50-percent change in ownership and thereafter fails "to carry on *substantially the same trade or business* as that conducted before the change." (Emphasis added.) We specifically reserved the question of what effect section 382(a) has upon the *Libson Shops* rationale as authority for cases arising under the 1954 Code in the recent case of *Arthur T. Beckett*, 41 T.C. 386 (1963), where we said (p. 416):

it might be that where the change in ownership provision of section 382(a) (1)(C) applied, the principle of the *Lisbon Shops, Inc.* case would be inapplicable since the statute now specifically provides the extent to which the net operating loss shall be disallowed under such circumstances.

In *Beckett*, the 50-percent-change-in-stockownership requirement of section 382(a)(1)(A) was not met. After examining the circumstances surrounding the Supreme Court's decision in *Libson Shops*, we concluded that, at least as to factual situations beyond the reach of the objective tests of section 382, the *Libson Shops* rationale was binding on us in cases arising under the 1954 Code.[6]

The parties agree that since Cooper acquired all of petitioner's stock the facts of this case bring it squarely within the ambit of section 382. Their dispute lies only in determining whether petitioner has continued to carry on the same type of business. See sec. 382(a)(1)(C). It might seem, at first impression, that whether *Libson Shops* is applied is immaterial, since both that case and the statute turn on the construction given to the phrase "same business," indicating that the same principles would govern the question under either the *Libson Shops* decision or section 382(a)(1)(C). But our analysis of the legis-

---

(i) the beginning of such taxable year, or

(ii) the beginning of the prior taxable year,

(B) the increase in percentage points at the end of such taxable year is attributable to—

(i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

(ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and

(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,

the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

[6] We note, however, that the Court of Appeals for the Ninth Circuit rejected this view, reasoning that the specific provisions of secs. 269, 381, and 382 of the 1954 Code take precedence, and held that *Libson Shops* is not valid under the 1954 Code. *Maxwell Hardware Co., supra.* Despite this setback, the Internal Revenue Service has indicated that it will continue to fight loss carryovers by relying on *Libson Shops* under the 1954 Code. See T.I.R. 773, Oct. 13, 1965.

lative history of section 382 in *H. F. Ramsey Co.*, 43 T.C. 500 (1965), reveals that such is not the case. We there stated (p. 514):

It would appear from the legislative history of section 382 that it was designed to automatically disallow the loss carryover when there was a change of ownership coupled with a change in the *type of business* conducted, to avoid the troublesome subjective question under section 269 of whether the principal purpose of the purchasers in acquiring control of the corporation was to avoid tax. But it would appear that there has to be a real change in the type of business conducted to come within this statute. This section as contained in the original House bill (H.R. 8300) provided only for a reduction in the amount of loss carryovers deductible where there had been at least a 50-percent change in the ownership of the corporation's stock. The report of the House Ways and Means Committee (H. Rept. No. 1337, to acompany H.R. 8300 (P.L. 591), 83d Cong., 2d Sess., p. 42 (1954)) explains that this provision was being added to supplement section 269 and that "It treats a business which experiences a substantial change in its ownership, to the extent of such change, as a new entity for tax purposes." However, the Senate Finance Committee rewrote the section to read as it does in the present law, denying the deduction entirely if there is the requisite change in ownership *and* a substantial change in the business. In explaining the change in its report (S. Rept. No. 1622, *supra* at 53) the committee said:

"Your committee has adopted a provision to limit the application of this provision relating to purchase to those areas in which abuse has most often arisen, that is, the purchase of the stock of a corporation with a history of losses for the purpose of using its loss carryovers to offset gains of a business unrelated to that which produced the losses.* * *"

The Senate Finance Committee accordingly provided that if there has been a 50-percent change in stock ownership through purchase and if the corporation thereafter engages in a *different type of business*, the loss carryover is to be eliminated as a deduction.

The *Libson Shops* decision did not construe the phrase "same business" to mean the same type of business, indicating an identity or similarity of economic endeavor. *Humacid Co., supra.* But it is clear from the legislative history that section 382(a)(1)(C) does require such identity or substantial similarity of economic endeavor. Since the phrase "same business" in *Libson Shops* does not mean the same thing as it does under section 382, the application of *Libson Shops* to the facts of this case would render section 382 meaningless. In the light of its legislative history, we think the purpose behind the enactment of section 382 was not the same as the rationale used in *Libson Shops.* Consequently, we hold that when the requisite change-in-ownership conditions of section 382(a)(1)(A) and (B) are met, the provisions of 382(a)(1)(C) exclusively govern the issue as to whether "the same business" is thereafter carried on.

Respondent finally contends that, even if section 269 and *Libson Shops* do not apply, the petitioner has run afoul of section 382(a)(1) (C), which requires it to carry on substantially the same trade or business as was carried on before the 50-percent change in stock ownership.

Specifically, respondent contends that the petitioner's failure to engage in manufacturing and sales activities during the period it regained its financial strength caused the petitioner to become "inactive" within the meaning of section 1.382(a)–1(h)(6), Income Tax Regs., which provides that—

A corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock if the corporation is not carrying on an active trade or business at the time of such increase in ownership. Thus, if the corporation is inactive at the time of such an increase and subsequently is reactivated in the same line of business as that originally conducted, the corporation has not continued to carry on a trade or business substantially the same as that conducted before such increase in stock ownership.* * *

Here we must determine not whether petitioner conducted the same business before and after the period of inactivity, but whether that period of inactivity itself (during which Cooper purchased petitioner's stock) caused the petitioner's resumption of manufacturing in April 1958 to be the conduct of a new business.

At the outset, we note that in *Fawn Fashions, Inc.*, 41 T.C. 205, 214 (1963), we expressed the opinion that the respondent's regulation is valid. The necessity for it is apparent, for as we noted in a footnote to *H. F. Ramsey Co., supra* at 515: "To conclude otherwise would make the statute completely ineffective to prevent trafficking in loss corporations within the same industry." See also *Glover Packing Co. of Texas* v. *United States*, 328 F. 2d 342 (Ct. Cl. 1964). But here, as in his argument concerning the *Libson Shops* doctrine, the respondent is urging us to extend the law beyond its limits.

Section 1.382(a)–1(h)(6), Income Tax Regs., requires that the loss corporation be *inactive* at the time of increased ownership. Thus, in *Fawn Fashions, Inc., supra*, we upheld the respondent's reliance on his regulation where the loss corporation had been placed in receivership, sold its assets, and, for over a year before its purchase by new owners, was kept alive only by virtue of its charter of incorporation. After the purchase the corporation was put through a bankruptcy proceeding by its new owners and then reactivated as a sales corporation.

However, in *H. F. Ramsey Co., supra*, when the respondent again relied on this regulation, we held it inapplicable. In that case the loss corporation had been engaged in the business of excavating rock for road construction on a contract basis. In May 1956 it notified its bonding company that it was unable to complete its existing contracts without financial assistance. The bonding company provided the needed assistance, but only on condition that no new business be undertaken until all existing contracts had been completed. As these jobs were completed, the equipment used to complete them was sold and

used to pay off the corporation's debts. The corporation completed substantially all its work on such contracts prior to the end of 1956 and used none of its equipment during 1957. Its only activities during 1957 were limited to administrative duties, collection of contracts, paying debts, and settling claims. In December 1957, having retained only $60,000 of its equipment, the corporation was sold and subsequently reactivated by the new owner. On these facts, we rejected respondent's reliance on section 1.382(a)–1(h)(6) with the following observation:

> While what Taylor and Bushnell [the purchasers] actually bought was pretty much of a shell corporation, petitioner was not a shell immediately prior to the negotiations for sale. It was a viable corporation which had been actively engaged in the road construction business but which was *temporarily inactive*. [Emphasis added.]

The facts before us in this proceeding are even stronger than those present in the *Ramsey* case. Here, unlike *Ramsey*, the petitioner did not sell its assets. It retained its plant and equipment and leased them to a sister corporation under an agreement giving petitioner a share of the profits to be earned by the manufacture and sale of rubber products.[7] Throughout the 2-year period from April 1956 until April 1958, petitioner negotiated with its creditors, defended its assets in lawsuits, sued to collect accounts receivable, and, in general, attempted to recover its financial health.

The substance of these transactions indicates that Cooper purchased a corporation engaged in the manufacture and sale of rubber products and continued thereafter to successfully operate it by temporarily segregating the income-producing activities from the financial pressures being brought to bear on petitioner's assets by its creditors. Respondent urges us to look to the form of this acquisition rather than its substance because the form was chosen by Cooper. This suggestion ignores the sound reasons which lay behind Cooper's choice, viz, insulation of the parent and the manufacturing and sales operations from the very financial hardships which caused Dismuke to sell the petitioner to Cooper in the first place. We would be ignoring economic reality if we were to decide that Cooper's decision to transfer the manufacturing operation to Clarksdale Manufacturing was supported by the necessity of petitioner's existing financial problems and then go on to hold that such a transfer to a wholly owned sister corporation resulted in the type of business "inactivity" Congress intended to suppress by the enactment of section 382, as amplified by section 1.382(a)–1(h)(6) of the regulations.

Having concluded that section 1.382(a)–1(h)(6) does not apply

---

[7] The rental income thus received by petitioner from Clarksdale Manufacturing did not constitute the entry by petitioner into a new business. See *Euclid-Tennessee, Inc.,* 41 T.C. 752 (1964), on appeal (C.A. 6).

here, we look to the factors mentioned in section 1.382(a)–1(h)(5)[8] to determine whether petitioner continued to conduct "substantially the same trade or business" after its acquisition by Cooper. As the regulation points out, all the facts and circumstances of the particular case must be taken into account, especially such relevant factors as "employees, plant, equipment, product, location, customers * * *." In the present case, a new management team supplied by Cooper replaced the decision-making personnel used by petitioner when it was owned by Dismuke. This new management team changed the names under which the products manufactured by petitioner's facilities were sold and it modified the sales organization and territory to a certain extent. However, in all other respects, the petitioner's activities after April 1958 were identical to those conducted by it prior to its acquisition by Cooper. These incidental alterations were, in our opinion, required by the dictates of the business and were well within the limits we established in *Goodwyn Crockery Co.*, 37 T.C. 355 (1961), affd. 315 F. 2d 110 (C.A. 6, 1963).

Accordingly, we hold that there was no failure to continue the same business within the intendment of the statute and regulations.

To reflect the agreement of the parties on some issues,

*Decision will be entered under Rule 50.*

[8] Sec. 1.382(a)–1(h)(5), Income Tax Regs.:

In determining whether a corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock, all the facts and circumstances of the particular case shall be taken into account. Among the relevant factors to be taken into account are changes in the corporation's employees, plant, equipment, product, location, customers, and other items which are significant in determining whether there is, or is not, a continuity of the same business enterprise. These factors shall be evaluated in the light of the general objective of section 382(a) to disallow net operating loss carryovers where there is a purchase of the stock of a corporation and its loss carryovers are used to offset gains of a business unrelated to that which produced the losses. However, the prohibited utilization of net operating loss carryovers to offset gains of a business unrelated to that which produced the losses is not dependent upon considerations of purpose, motive, or intent, but rather is established by the objective facts of the particular case. The principles set forth in this subparagraph shall be applied in accordance with the rules set forth in the following subparagraphs of this paragraph.