Lake Textile Co., Inc., et al. [1] v. Commissioner. Lake Textile Co. v. Commissioner
Docket Nos. 1233-66, 1252-66 - 1255-66, 1272-66, 6723-66 - 6726-66, 6735-66, 6745-66.
United States Tax Court
T.C. Memo 1969-44; 1969 Tax Ct. Memo LEXIS 252; 28 T.C.M. (CCH) 246; T.C.M. (RIA) 69044; March 5, 1969, Filed *252 G operated the soft goods departments in several discount department stores and formed a separate corporation for the operation in each store. He and his wife held all the outstanding stock in such corporations. The evidence indicates that the separate corporations were formed for business reasons and that tax consequences were not considered. G made loans to one of the petitioners with no obligation to pay interest and no due date, but after several years, the debtor made payments to G which were deducted as interest. Held: (1) The evidence as to the reasons for the formation of the separate corporations is credible, and it is found that the corporations were not acquired for the purpose of evading or avoiding Federal income tax. (2) The amounts paid by one of the petitioners to G are not deductible as interest since no obligation to pay such interest has been established. Donald J. Holzman, 720 Liberty Bank Bldg., Buffalo, N. Y., for the petitioners. John E. White, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion
*254 SIMPSON, Judge: The respondent determined deficiencies in the income taxes of the petitioners as follows: [SEE TABLE ON PAGE 247] Some of the issues raised by the deficiency notices have been disposed of by the parties. The remaining questions to be decided are: (1) Whether each petitioner is entitled to a full $25,000 surtax exemption; (2) Whether the petitioners are subject to the accumulated earnings tax; and (3) Whether certain payments by one of the petitioners to its major stockholder are properly deductible as interest payments. Findings of Fact Some of the facts have been stipulated, and those facts are so found. Each of the petitioners is a New York corporation which had its principal office in Tonawanda, New York, at the time its petitions were filed in these cases. Each of the petitioners filed its Federal income tax returns for the years involved in these cases with the district director of internal revenue, Buffalo, New York. Until 1957, Mr. Oscar R. Goldman had spent his adult earning career working solely as an employee for various department stores. His activities in such employment were restricted to merchandising soft goods, and he took no part *255 in the general financial affairs of such stores. In 1957, at a time when Mr. Goldman felt he had no chance for further advancement in his employment and was contemplating changing jobs, he was offered the opportunity to go into business for himself as the operator of the linens, domestics, draperies, and infants' wear departments in a new discount department store to be opened by The Twin Fair, Inc. (Twin Fair), in Depew, New York. The proposal entailed the leasing of space in the Twin Fair store and the operation of, what was in effect, a store within a store. Upon learning of the opportunity, Mr. Goldman consulted a lawyer friend, Aaron Yasinow, on the merits of the proposition. Until that time, Mr. Goldman's relationship with Mr. Yasinow had been purely social. After such consultation, Mr. Goldman decided to enter into the proposed arrangement, and on August 8, 1957, he executed a lease agreement with Twin Fair. On the advice of Mr. Yasinow, it was decided to operate the business in corporate form, and accordingly, Mr. Goldman assigned the lease to the petitioner, Jonan Textile Co., Inc. (Jonan), on the same date it was 247 *11
Deficiency
Docket No.
Taxable Year Ended
Sec. 11 Tax [2]
Sec. 531 Tax
Jonan Textile Co., Inc.
1252-66
June 30, 1961
$1,973.27
June 30, 1962
2,270.98
June 30, 1963
5,734.70
6723-66
June 30, 1964
5,134.57
$4,585.98
June 30, 1965
4,417.59
4,093.68 Amherst Textile Co., Inc.
1272-66
Sept. 30, 1960
$2,105.21
Sept. 30, 1961
2,693.32
Sept. 30, 1962
175.21
Sept. 30, 1963
5,000.05
6735-66
Sept. 30, 1964
1,442.93
$2,205.63
Sept. 30, 1965
3,153.32
3,230.97 Clarence Textile Co., Inc.
1253-66
Dec. 31, 1960
$2,005.35
Dec. 31, 1961
1,304.40
Dec. 31, 1962
1,616.05
Dec. 31, 1963
2,903.23
Lake Textile Co., Inc.
Lake Textile Co., Inc.
1233-66
March 31, 1961
$2,013.14
March 31, 1962
1,307.41
March 31, 1963
2,512.38
6724-66
March 31, 1964
3,752.85
$3,666.65
March 31, 1965
1,578.49
2,740.71 Eggert Textile Co., Inc.
1254-66
April 30, 1963
$1,341.94
6745-66
April 30, 1964
1,886.05
$2,109.03
April 30, 1965
4,293.95
3,438.91
Elmwood Textile Co., Inc.
1255-66
May 31, 1963
$1,507.81
6725-66
May 31, 1964
4,809.26
$4,656.43
May 31, 1965
4,148.52
3,936.90
*256 Some of the issues raised by the deficiency notices have been disposed of by the parties. The remaining questions to be decided are: 248 cuted. Jonan was incorporated on August 29, 1957, with 200 shares of no-par common voting stock authorized. Seventy-five shares were issued to Mr. Goldman and 25 shares were issued to his wife, Lucille Goldman; the remaining 100 authorized shares were not issued. Jonan was capitalized with $16,939.88 contributed by Mr. Goldman. Messrs. Goldman and Yasinow decided to operate in corporate form principally to limit the personal liability of Mr. Goldman to his investment in the business. Mr. Yasinow did not advise Mr. Goldman of the method of taxation of corporations; tax considerations were not discussed and did not enter into the decision to form Jonan. Following the creation of Jonan, Mr. Goldman sought the advice of a public accountant, Isadore Silverstein, concerning the setting up of corporate books and records. Mr. Silverstein did not participate in the decision to form Jonan and did not at the time of this consultation advise Mr. Goldman or Mr. Yasinow of the *257 method of taxation of corporations. In the middle of 1958, Mr. Goldman was informed by Twin Fair that it was going to build a second store in Amherst, New York, and he was offered the opportunity to operate the same departments there as were being operated by Jonan in the Depew store. Mr. Goldman was reluctant to accept this offer. His investment in the new store would have to be substantial and, he did not consider its location to be promising for a discount department store. On the other hand, Twin Fair was anxious to have him accept the proposal; and Mr. Goldman felt that if he did not do so, he might be excluded from any other new stores opened by Twin Fair and, even worse, he might be forced out of the Depew store. After conferring with Mr. Yasinow, Mr. Goldman decided that he had to accept the new Twin Fair proposal, and the lease between Twin Fair and Mr. Goldman with respect to the Amherst store was executed on June 25, 1958. The lease was assigned by Mr. Goldman to the petitioner, Amherst Textile Co., Inc. (Amherst), on the same date. Amherst was incorporated on November 20, 1958, with 200 shares of no-par common voting stock authorized. Seventy-five shares were issued *258 to Mr. Goldman and 25 to his wife; the remaining 100 authorized shares were not issued. Amherst was capitalized with $1,000. The decision to organize a separate corporation to operate the departments at the Amherst store was made by Messrs. Goldman and Yasinow and was based on the following considerations. First, it was felt that if it became desirable to sell one of the businesses, its sale would be facilitated by having a separate corporation for each operation. Selling a separate corporation would be simpler than selling some of the assets of a single enterprise. The business records of each corporation would be kept separately so that a potential buyer would have access to only the records of the business being sold. Second, in the event Mr. Goldman could not directly manage both the Jonan and Amherst operations, it was thought that by having separate corporations, he could secure effective managerial assistance by granting, or selling, a manager a stock interest in the corporation whose activities he was managing. By having separate corporations, Mr. Goldman would not have to relinquish an equity interest with respect to the operation in which the manager had no part, and such *259 manager would not have access to records concerning the other operation. Third, capital could be raised for a particplar operation by the sale of stock in the corporation carrying on such operation without giving the investor an interest in the other operation or access to its records. Fourth, it was thought that existence of separate corporations would insulate each operation from the obligations of the other. In determining to organize Amherst, Messrs. Goldman and Yasinow did not consider the tax consequences of operating in corporate form or of operating separate corporations. Following the creation of Amherst, Mr. Goldman again sought the advice of Mr. Silverstein in setting up books and records for the new corporation. Mr. Silverstein did not participate in the decision to organize Amherst as a separate corporation and did not at that time advise either Mr. Goldman or Mr. Yasinow as to the method of taxation of corporations. The Amherst lease required an advance rental deposit of $22,500. Mr. Goldman was not able to supply this amount from his own resources and, accordingly, he sought financing from the Manufacturers and Traders Trust Company (M & T). M & T agreed to make *260 loans of only $12,500, and Mr. Goldman was obliged to borrow the remaining $10,000 from friends and family. The latter amount was then advanced by Mr. Goldman to Jonan. The 249 M & T loans were made directly to Jonan. Mr. and Mrs. Goldman guaranteed the obligations of Jonan to M & T. Twin Fair opened four additional stores in the greater Buffalo metropolitan area in 1959 through 1961. In each case, Mr. Goldman was offered the opportunity to operate the linens, domestics, draperies, and infants' wear departments, and in each instance he accepted, although the financial burden was usually great and some of the stores were, in his opinion, in undesirable locations. For each of the new Twin Fair stores, Mr. Goldman individually executed a lease and assigned it to a separate corporation. Each of those corporations are petitioners herein. Below is a table setting forth facts concerning such petitioners. Clarence
Lake
Eggert
Elmwood
Textile
Textile
Textile
Textile
Co., Inc.
Co., Inc
Co., Inc.
Co., Inc.
(Clarence)
(Lake)
(Eggert)
(Elmwood)
Location of Store
Clarence
Hamburg
Tonawanda
Buffalo
Date of incorporation
3/23/59
9/ 8/59
9/26/60
7/13/61
Authorized shares
200
200
200
200
Stock issued to Mr. & Mrs. Goldman
100
100
100
100
Capitalization
$ 1,000
$ 3,000
$ 1,000
$ 1,000
Date of lease
10/28/58
6/11/59
8/ 1/60
9/22/61
Date of assignment of lease
10/28/58
6/11/59
8/ 1/60
9/22/61
Advance deposit required
$22,500
$22,500
$13,750
$25,000
Amount borrowed to pay advance deposit
$22,500
$12,500
$ 7,000
$24,000
*261 In order to provide funds for the payment of advance rental deposits for the Clarence, Hamburg, Tonawanda, and Buffalo locations, $56,000 was borrowed from M & T and $10,000 was borrowed from the BuffaloHebrew Social Club Federal Credit Union. M & T loans were made to Jonan; Mr. and Mrs. Goldman, Amherst, Clarence, and Lake each guaranteed repayment of all obligations of Jonan to M & T. The loan from the credit union was made to Mr. Goldman who then advanced the money to Jonan. After the formation of Amherst, there were no detailed discussions on the question of whether to form separate corporations for each new location. It was felt by Messrs. Goldman and Yasinow that the same considerations which resulted in the formation of Jonan and Amherst recommended separate corporations for each operation, and at this point the procedure for establishing a new corporation for each new location had become automatic. The decisions to form Clarence, Lake, Eggert, and Elmwood were not based in any way on tax considerations. Mr. Silverstein did not participate in the decisions to go into the new Twin Fair locations or to form separate corporations to do so. In 1962, the ownership of Twin *262 Fair changed hands, and the new owner became desirous of acquiring the petitioners' businesses. Finally, in January 1966, the petitioners sold their assets to Twin Fair. The following table sets forth the accumulated earnings and profits of the petitioners as of the end of the tax years indicated: *11
Taxable Year Ended
6/30/63
6/30/64
Jonan
$ 43,752.08
$ 60,268.10
9/30/63
9/30/64
Amherst
42,031.23
49,514.58
12/31/63
12/31/64
Clarence
37,050.4 2
42,770.21
3/31/63
3/31/64
Lake
30,325.92
40,730.24
4/30/63
4/30/64
Eggert
8,965.91
14,089.58
5/31/63
5/31/64
Elmwood 9,252.52
23,247.70
Total $171,378.08
$230,620.41 By January of 1959, Mr. Goldman had advanced at least $20,000 to Jonan. No notes evidenced this indebtedness, and it was not until 1962 that Jonan made any payments with respect to such indebtedness. In each of the years 1962, 1963, and 1964, Jonan paid $2,000 to Mr. Goldman, which Jonan claimed as interest deductions on its income tax returns for its taxable years ended June 30, 1963, June 30, 1964, and June 30, 1965. Opinion The respondent has determined that the principal purpose for the formation of *263 the petitioners was the avoidance of Federal income taxes by obtaining multiple surtax exemptions and minimum accumulated earnings credits. Accordingly, pursuant to section 269, he has allocated a single surtax exemption and minimum accumulated earnings credit among all the petitioners. This allocation resulted in deficiencies in section 250 11 and section 531 income taxes. An additional issue concerns the respondent's determination that certain payments made by Jonan to Mr. Goldman were not deductible under section 163 as payments of interest. Issue 1 The Surtax Exemptions The corporate surtax is imposed on annual taxable income in excess of the $25,000 surtax exemption. Section 11(c) and (d). However, pursuant to section 269(a), the Commissioner may deny the surtax exemption in whole or in part when he determines that the taxpayer was acquired for the principal purpose of evading or avoiding Federal income tax by obtaining the benefits of such exemption. James Realty Company v. United States, 280 F. 2d 394 (C.A. 8, 1960); Joe (Joseph) Dillier, 41 T.C. 762 (1964), affd. per curiam sub nom. Made Rite Investment Co. v. Commissioner, 357 F. 2d 647 *264 (C.A. 9, 1966). The petitioners contend that the respondent's allocation of a single surtax exemption among them is improper since they were not formed or acquired for the principal purpose of avoiding or evading income tax. The petitioners bear the burden of proving such lack of purpose, and they have done so. Rule 32, Tax Court Rules of Practice; Clarksdale Rubber Co., 45 T.C. 234, 240-241 (1965). At the trial of this proceeding, Messrs. Goldman, Yasinow, and Silverstein testified as to their part in the formation of the petitioners. The petitioners were formed as a consequence of decisions reached by Messrs. Yasinow and Goldman. The reasons for such decisions are detailed in our Findings of Fact and do not include the evasion or avoidance of tax. In fact, the evidence indicates that tax consequences were not even considered in the decisions to form the petitioners. The witnesses were credible and convincing, and we conclude that the proscribed purpose necessary for the application of section 269 was not present in the formation of any of the petitioners. Our conclusion is supported by the facts surrounding the formation of the petitioners and the backgrounds of *265 the witnesses. Until 1957, Mr. Goldman had never operated his own business and there is no reason to believe that, prior to the formation of Amherst, he was cognizant of the aspects of corporate tax law involved in these cases. The decisions to form the petitioners were made in the context of substantial business and financial pressures. The crucial questions were whether business reasons supported going into the Twin Fair locations and if so how to raise the capital necessary to finance the ventures. Mr. Yasinow was primarily involved in negligence work, did not generally give tax advice, and never prepared corporate tax returns. The respondent does not contend that section 269 may be applied in the absence of an actual purpose to evade or avoid tax. Such a contention would be clearly without merit. See Hawaiian Trust Company Limited v. United States, 291 F. 2d 761, 765-766 (C.A. 9, 1961); Clarksdale Rubber Co., supra; S. Rept. No. 627, 78th Cong., 1st Sess., p. 27 (1943), 1944 C.B. 973, 994. Rather, the respondent's argument is devoted to demonstrating that the reasons advanced by Messrs. Goldman and Yasinow could not have been the real considerations *266 in the formation of the petitioners. The respondent argues that if limited liability was of vital importance to Mr. Goldman, he would not have personally executed leases with Twin Fair, would not have guaranteed, along with his wife, Amherst, Clarence, and Lake, repayment of obligations owing to M & T, and would not have personally borrowed other funds necessary to pay advance rental deposits. Additionally, the respondent contends that the sale of individual operatiog units would be no more difficult if such units were operated as branches of a single enterprise than it was when they were operated as individual corporations. In this regard, he stresses that when the businesses were disposed of in 1966, it was by way of an asset sale rather than a stock sale. Finally, the respondent argues that it would be highly unlikely that Mr. Goldman would ever partially dispose of his stock holdings in any of the petitioners. If he wished to raise capital, he could do it by borrowing rather than by selling stock. If he wished to provide an incentive for the manager of an individual operation, he could do it by bonus compensation rather than by giving up partial ownership of the business. *267 Although the respondent's arguments have some merit, they do not render the reasons advanced for the petitioners' formation incredible. Despite the fact that limited liability was voluntarily forfeited as to M & T, Twin Fair, and certain other creditors, it remained a factor with respect to suppliers, 251 and others, who by virtue of law or agreement, could only be satisfied out of the assets of a single petitioner. The respondent's attack on the other reasons advanced for the petitioners' formation ignores the fact that multiple corporations allowed Mr. Goldman the use of alternative means of dealing with such common business problems as liquidation, finance, and management. That such alternatives were not employed does not establish that they were not the actual considerations in the formation of the petitioners. The crucial question is not whether the reasons advanced by the witnesses are so weighty as to have required the petitioners' formation; rather, the question is whether those were the real reasons that caused Mr. Goldman to form the petitioners. Certainly the credibility of the reasons advanced for forming the petitioners must bear on our conclusion as to principal *268 purpose, Joe (Joseph) Dillier, supra, at 785-788, but in this case, we do not think that the reasons advanced were so weak as to justify our disregarding the forthright and believable testimony of the witnesses. Issue 2 The Accumulated Earnings Tax Our conclusion that section 269 does not apply has the effect of also disposing of the accumulated earnings tax issue. Since section 269 does not apply, each of the petitioners is entitled to a full minimum accumulated earnings credit under section 535(c)(2). For each year, such credit is equal to $100,000 reduced by the amount of accumulated earnings and profits at the beginning of the year. When applied to the facts of this case, the petitioners' minimum credits completely offset all accumulated taxable income determined by the respondent without regard to such credits. Accordingly, it is unnecessary for us to consider the reasonableness and purpose of the accumulations. Issue 3 The Deduction for Interest The petitioner Jonan made payments of $2,000 to Mr. Goldman in each of the years 1962, 1963, and 1964. These payments were deducted by Jonan on its income tax returns on the theory that they were payments of interest *269 in respect of a $20,000 indebtedness which had been extant since 1959. The respondent, conceding that there was a bona fide indebtedness of $20,000, has nevertheless denied the interest deduction on the ground that Jonan was under no obligation to pay interest. D. Loveman & Son Export Corporation, 34 T.C. 776, 805-806 (1960), affd. 296 F. 2d 732 (C.A. 6, 1961), cert. denied 369 U.S. 860 (1962); Howell Turpentine Co., 6 T.C. 364, 393-394 (1946), revd. on other grounds 162 F. 2d 319 (C.A. 5, 1947). We think that Jonan has failed to prove that it was under such an obligation, and accordingly, we sustain the respondent's determination in this respect. Jonan has not argued that prior to 1962 it had any obligation to pay interest in respect of its indebtedness to Mr. Goldman, but it asserts that in that year it became so obligated. The only evidence offered by Jonan to support this contention is the testimony of Mr. Goldman to the effect that there came "a time when interest was specified and required with regard to the loan," and that he believed the corporate minutes of Jonan reflected such obligation. The minute book *270 of Jonan was never introduced into evidence, so we cannot ascertain whether this "belief" is supported by fact. There is no note with respect to the indebtedness, and the testimony of Mr. Goldman does not disclose when and how it became specified and required that interest be paid. Nothing indicates that Mr. Goldman ever demanded that Jonan either pay him interest or repay the principal amount of the indebtedness. The evidence adduced by Jonan is conclusory and speculative; in these circumstances, we must sustain the respondent's determination. Jonan argues that under New York law, when no time for repayment of a loan is specified, the loan is payable on demand. Wallach v. Dryfoos, 140 App. Div. 438, 125 N. Y. S. 305 (1st Dept. 1910). From this, it reasons that Mr. Goldman had the option of requiring Jonan to either pay interest on its indebtedness or repay such indebtedness forthwith. However, we fail to perceive how this principle establishes that Jonan was at any time obligated to pay interest to Mr. Goldman. It may be that Mr. Goldman had the right to require Jonan to pay interest to him, but in the absence of evidence that he asserted such right, we can find no *271 obligation. Decisions will be entered under Rule 50. 252 Footnotes
1. Cases of the following petitioners are consolidated herewith: Jonan Textile Co., Inc., Docket Nos. 1252-66 and 6723-66; Clarence Textile Co., Inc., Docket Nos. 1253-66 and 6726-66; Eggert Textile Co., Inc., Docket Nos. 1254-66 and 6745-66; Elmwood Textile Co., Inc., Docket Nos. 1255-66 and 6725-66; and Amherst Textile Co., Inc., Docket Nos. 1272-66 and 6735-66.↩
2. All statutory references are to the Internal Revenue Code of 1954.↩