Arwood Corporation v. Commissioner.
Arwood Corp. v. Commissioner
Docket Nos. 1917-66, 6476-67.
United States Tax Court
T.C. Memo 1971-2; 1971 Tax Ct. Memo LEXIS 330; 30 T.C.M. (CCH) 6; T.C.M. (RIA) 71002; January 6, 1971, Filed *330 Held, the principal purpose for the merger of three corporations was the acquisition of patents and technical know-how in the investment casting field and not the acquisition of net operating loss carryovers. Section 269 of the 1954 Code does not, therefore, prohibit the carryover of the loss deductions by the resulting corporation, the petitioner herein. Held, further, the substantiation of the amount of the net operating losses of two corporations was placed in issue in the respondent's amended answer and was not raised in the statutory notice. The respondent, therefore, has the burden of proof on this question. He has failed to carry this burden. 7 Held, further, the prime cost method of valuing work-in-process inventory did not clearly reflect the petitioner's income during the years in issue, and the use of the full cost absorption method by the respondent was not shown to be arbitrary. The respondent's method, therefore, was properly employed to value such work-in-process. All Steel Equipment, Inc., 54 T.C. 1749 (1970), followed. Held, further, the petitioner's basis in the work-in-process inventory it acquired in the merger was the transferor's basis in such inventory, pursuant *331 to sections 1013 and 362 of the 1954 Code. The respondent has carried his burden of proof on this question. James A. Cuddihy, Herbert J. Korbel, [1] and Gerald H. Litwin 99 Park Ave, New York, N. Y. for the petitioner. Henry L. Glenn, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: The respondent has determined a deficiency in the petitioner's income tax in each of the calendar years 1960 through 1965 as follows: Year
Deficiency
1960
$ 504,786.41
1961
449,402.80
1962
89,901.23
1963
150,194.17
1964
65,539.44
1965
125,142.66
The issues presented for our decision are: (1) Whether net operating losses incurred by two corporations during the years 1955-1959 may be carried forward by the petitioner or whether such carryovers must be denied because the principal purpose for the merger involving these corporations was the securing of the loss deductions, and whether the *332 amounts of those loses, disputed by respondent in an amended answer but not challenged in the notice of deficiency, are less than claimed by petitioner and originally admitted by respondent's answer. (2) Whether the petitioner's method of valuing its work-in-process inventory during the years 1960-1965 was a method which clearly reflected its income. A third issue, involving the deductibility of reorganization expenses, has been conceded by the petitioner. Findings of Fact Some of the facts in this case have been stipulated by the parties. The stipulation of facts and exhibits thereto are incorporated herein by this reference. At the time its petition was filed in Docket No. 1917-66, the petitioner's principal offices were located in New York, New York. At the time its petition was filed in Docket No. 6476-67, the petitioner's principal offices were located in Rockleigh, New Jersey. The petitioner's Federal income tax returns for all years in issue were filed with the district director of internal revenue, Manhattan District, New York, New York. Prior to 1943, J. R. Wood & Sons, Inc. ("JRW"), a New York corporation engaged in manufacturing jewelry, formed a division to make industrial *333 parts by the Lost-Wax investment casting process. The manager of this division was Rawson L. Wood ("Wood"). On March 12, 1943, JRW incorporated this division as J. R. Wood Products Corporation ("Products") under the laws of the State of New York. In 1946, JRW sold all of the outstanding stock of Products to Wood. The name of Products was changed in about 1948 to Arwood Precision Casting Corporation ("APC"). Wood served as president of Products (and later APC) from 1946 to 1960. [2] Mercast Corporation ("Mercast") was incorporated on June 30, 1945, under the laws of the Stae of Delaware. Its name was changed to Mertronics Corporation on June 28, 1960. Mercast was formed for the purpose of developing and exploiting a patented process useful in the investment casting field and employing frozen mercury for the formation of disposable patterns. AlloyPrecision Castings Company ("Alloy") was incorporated on *334 June 28, 1950, under the laws of the State of Delaware. 8 In 1953, Industrial Metal Castings Corporation was incorporated under the laws of the State of Ohio. Its name was changed to Mercast Manufacturing Corporation ("Manufacturing") on February 16, 1955. Mercast acquired all of the outstanding stock of Alloy in a series of acquisitions, commencing in 1951 and ending on December 11, 1956, and Mercast acquired all of the outstanding stock of Manufacturing on April 20, 1954. The principal business of Alloy, Manufacturing, APC, and Arwood Corporation at all relevant times was the manufacture and sale of parts produced to customer specifications and designs from dies by the use of the investment casting process. On December 31, 1958, and on December 31, 1959, Alloy owned 100 percent of the stock of a subsidiary called " 3855 West 150, Inc.," which corporation in turn owned an empty building located in Cleveland, Ohio, and the land on which the building was situated. The empty building had a book value as of December 31, 1959, of $269,148.28 and the land had a book value of $48,960. Together they had a book value of $500,000 on December 31, 1958. The land and building were subject to *335 a mortgage since acquisition. 3855 West 150, Inc. was organized on March 21, 1957, and commenced operations on March 26, 1957. During the period 1955 through November 1958, Alloy's principal place of business was at Cleveland, Ohio. In September 1958, the Board of Directors of Mercast authorized termination of Alloy's manufacturing operations at its Cleveland plant and all production at that plant was discontinued by the end of that year. Where feasible, uncompleted orders and rework were then transferred to Manufacturing in LaVerne, California. Alloy's machinery, equipment, tools, dies, furniture, fixtures, and supplies which could be utilized by Manufacturing were transferred to its LaVerne plant. (The remainder of such assets were sold at auction on March 24, 1959). By November 1958, Alloy's assets included the license agreement with Mercast, the Cleveland plant, the Cleveland land, and the equipment not transferred to Manufacturing. During the period 1955-1959, Manufacturing's principal place of business was at LaVerne, California. During 1959, Manufacturing also held itself out to the trade as having a sales office in Cleveland, Ohio, at Alloy's Cleveland plant. By agreement, *336 dated April 26, 1946, E. F. Kohl granted Mercast an exclusive license (including the right to sublicense) under U.S. Patent No. 2,400,831 (issued to Kohl on May 21, 1946), dealing with making molds by the casting of patterns of frozen mercury. The license covered all further developments or improvements owned or acquired by Kohl prior to December 31, 1964. As of June 1, 1957, Mercast had exclusive rights under Kohl's United States patent relating (1) to the use of frozen mercury patterns for the production of precision casting molds, (2) to materials desirable in the formation of porous shell molds, (3) to desirable features of shell molds formed around such patterns, and (4) to processes for the formation of such molds. The Kohl patent on the frozen mercury process (the Mercast process) was in use in the late 1940's by a company called National Bronze and Aluminum Company, under a license from Mercast, which license was later transferred to Alloy. As of June 1, 1957, Mercast had granted four domestic sublicenses under the Kohl patents, one to Thompson Products, Inc., one to Kolcast Industries, Inc., one to Alloy and one to Manufacturing. Casting involves the reproduction of parts *337 of uniform shape and size by pouring molten metal into a mold and, once the metal solidifies, by letting it assume the shape of the mold. Investment casting is a technique for producing metal castings of extremely close tolerances in high temperature alloy. Ordinarily, a customer for such castings presents to the casting company a blueprint and a set of specifications of the particular part desired. The blueprint and specifications are reviewed by the company's estimating department for the purpose of determining feasibility and cost of production. If the order is accepted by the company, the next step is the production of a metal die. It can be produced (1) by machining into aluminum, magnesium, or steel, or (2) from a master pattern. The hollow die is the reverse of the part to be manufactured. Three methods of investment casting pertinent to a discussion of the issues 9 presently before us are (1) the Mercast process, (2) the Lost-Wax process, Solid Mold method, and (3) the Lost-Wax process, Ceramic Shell method, a more recent development and a combination of the techniques employed in the first two methods. Under each of these methods of manufacturing metal parts, it is necessary *338 first to produce a die, then to use the die to produce a mold, and third to use the mold to produce the finished part. (1) The Mercast process is a patented investment casting process, employing frozen mercury for the formation of disposable patterns. Under the Mercast process of investment casting, liquid mercury is poured into a steel die, and the die is then immersed in a freezing bath. The frozen mercury pattern is then successively dipped into a ceramic slurry (liquid mixture) until a ceramic shell mold about one-eighth of an inch thick is built up around it. At this point the mercury is extracted by bringing the assembly (consisting of the mold and the pattern) to room temperature and pouring off the mercury. The shell mold is then fired at a temperature of about 1850degree F. for two hours. Subsequently, molten casting metal is poured into the ceramic mold to make the casting. With frozen mercury, complex shapes can be made quite simply because of the "self welding" property of frozen mercury patterns. Such patterns, when placed together with slight pressure form a single solid piece. During and prior to the years at issue, the details concerning the use and preparation of the *339 ceramic shell employed in connection with the Mercast process, was a subject of considerable trade secrecy. (2) Under the Lost-Wax Solid Mold method of investment casting, molten wax is injected under pressure into the metal die and is permitted to cool and solidify under the pressure of an injection press. Secondary wax connections are then attached to the wax pattern, which is then dipped into a ceramic slurry and stuccoed with a fine grain refractory material for the purpose of forming the wall with which the molten metal used to make the mold will eventually come into contact. The ceramic-coated wax is then placed in a steel flask large enough to have a clearance of 4 to 5 inches on every dimension except the bottom, whereupon solid mold in a liquid state is poured into the flask at room temperature so as to completely surround the wax set-up. The solid mold is permitted to air dry at room temperature. Then the flask is placed in an oven whose temperature is slowly raised to 1800degree F., at which temperature the wax is removed, thereby creating a cavity in the solid mold. Molten metal is poured into this cavity which, while cooling at room temperature, assumes the shape of the *340 part to be produced. (3) Under the Lost-Wax Ceramic Shell method of investment casting, molten wax is injected under pressure into the die and permitted to cool and solidify. After secondary wax connections are attached, the wax pattern is dipped some 8 to 12 times in a ceramic slurry and stuccoed with a refractory material until a ceramic layer about one-quarter inch thick is built up around the wax set-up. The set-up is then flash fired to remove the wax. Molten metal is poured into the resulting cavity which, while cooling at room temperature, assumes the shape of the part to be produced. In the Lost-Wax Solid Mold method, the ceramic coating on the wax is used to form the inside wall of the mold. In the Lost-Wax Ceramic Shell method, the ceramic coating on the wax becomes the mold itself, a technique derived from the procedures followed in producing parts by the Mercast process. After the metal has been cooled (whether the investment casting method employed is the Solid Mold or the Ceramic Shell method), the metal casting (i.e., the part) has to be removed from the material which surrounds it. This is done either (1) mechanically, by vibrating hammers, or (2) chemically, by bleaching *341 in a caustic bath. Next, extraneous metal has to be removed from the part, and this is usually done by belt grinding or hand filing. When investment castings up to 3 to 4 inches in size are produced by the Lost-Wax Solid Mold method, it takes about 24 hours for the mold to air dry after the solid mold is poured around the wax set-up, 1 to 3 days to bring the dried mold to 1800degree F. in the furnace to remove the wax, 24 hours to bring the solid mold to pouring temperature, 4 to 6 hours for the metal to cool, and at least 1 hour to remove the solid mold from the metal casting. As a dimension of the metal casting doubles or triples, these time periods also double or triple. 10 Under the Lost-Wax Ceramic Shell method of investment casting, the dipping, stuccoing, and drying of a shell takes 1 to 2 days, removal of the wax takes 20 minutes, bringing the shell to pouring temperature takes 20 minutes, cooling of the metal takes about 1 hour, and removal of the shell from the metal casting takes 10 to 15 minutes. The heating and cooling times are considerably shorter in the case of the Ceramic Shell method than in the case of the Solid Mold method because of great thermal stability of *342 the ceramic shell. The solid mold has a tendency to crack when exposed to non-gradual changes in temperature. Furthermore, the ceramic shell is much thinner than the solid mold. The time needed to separate and to surface finish the metal casting is considerably shorter in the case of the Ceramic Shell method than the Solid Mold method because of the greater tenacity of the solid mold and its resultant tendency to cling to the metal casting which it surrounds and because the solid mold has a proclivity for cracking, necessitating increased machining of the parts produced. The Solid Mold process of investment casting is normally used for a smaller part. It can be used for parts 3 to 4 inches in diameter, but it is an impractical method for casting such parts and is normally not used. The process is not employed to make parts as large as 18 inches in diameter and 12 inches in height. The shell method can make these larger castings. APC had been attempting to develop a Ceramic Shell technique for investment casting since at least 1953. In 1953, APC employed solely the Solid Mold method of investment casting. APC was capable of producing parts measuring approximately one inch in any single *343 direction, weighing less than one ounce, and selling for less than one dollar. Although APC, during the period 1953 through 1959, principally made smaller parts for the aircraft industry, it made larger castings by the Solid Mold method on a development project basis. During this period, the aircraft industry was the principal customer of APC and the orders from that industry were for castings of very small sizes which were made by APC, employing the Solid Mold process. In 1952, the Ceramic Shell technique was used exclusively in connection with the Mercast process employed by Mercast and Alloy. At the time, the only way to obtain all the advantages of this method was by using frozen mercury. The compatibility of the Ceramic Shell method with the Lost-Wax process was not then known. In 1953, the ceramic department of APC's research and development group, in an effort to produce larger parts, commenced work on development of a Ceramic Shell method. In order to expedite its development of a Ceramic Shell method, APC, by agreement dated November 11, 1958, obtained from Met-Ceram, Inc., a license to utilize its process for the manufacture of shell molds for castings, but the process proved *344 useless and the license was canceled in July 1959. By the end of 1959, APC was still unable to go into the regular production of castings by a Ceramic Shell technique. APC was producing some castings under this method on an experimental basis and made some public statements concerning the company's production capabilities, but in fact the company was some time away from producing larger parts under the Ceramic Shell method on a regular basis. APC's Vice President for Sales, William O. Sweeny ("Sweeny"), a professional metallurgist, first saw the Ceramic Shell method of investment casting in use when in the late 1940's, as Chairman of the American Foundry Society's Committee on Investment Casting, he visited the Cleveland facility of National Bronze and Aluminum Company ("National") where such method was being employed in conjunction with frozen mercury. It was Sweeny's understanding that National was then operating from a license from Mercast based on the Kohl patent. In the early part of 1959, the officers of APC were rather optimistic about the company's future capability to produce large parts with a Ceramic Shell technique. Certain experimental projects were being conducted at *345 the company's Los Angeles plant, but some difficulty was experienced in the foundry. Other experimental work was being conducted at APC's plants in Groton, Connecticut, and Tilton, New Hampshire, although those plants needed additional equipment. In June 1959, numerous investment casting companies were already in production of castings by the Ceramic Shell technique and were marketing and accepting orders for them. APC was not in that position, 11 and it was anticipated that the company would not be for some time. On June 22, 1959, Harry Matthieson ("Matthieson"), the vice president in charge of research, reported to the board of directors of APC on the shell process progress at the various plants. He contended that APC was advancing as well as the rest of the industry, but estimated that it would take two or three months before experiments could be completed and before enough factual data to market the process could be obtained. He also estimated that if the experiments then in progress proved satisfactory and marketable, APC would need to expend approximately $350,000 for new equipment before it could go into full production. On October 26, 1959, Matthieson gave a further report *346 to the APC board of directors on the status of production activity at all plants with respect to the shell process. He also reported on the activities of APC's competitors. On November 23, 1959, Matthieson reported to the board of directors on the latest progress concerning the Ceramic Shell method. He felt that, as far as dimensional information was concerned, the research on the process should reach a stage by the beginning of 1960 which would permit the sales department to begin promotional efforts, but only to a modified degree. He cautioned, however, that the process would require constant revision for quite awhile. The only action taken by the board of directors at the meeting was to direct that APC should proceed with planning additional space to house the necessary equipment for producing 200 shells a month at $50 a shell. Matthieson was in fact too optimistic in his expectations. At the end of 1959, APC's capacity to produce casting in normal production was limited to parts no greater than 3 to 4 inches in size, and, based on the progress that had been made in APC's research program, the company was approximately one to two years away from the regular production of large castings *347 by the Ceramic Shell method. At the close of 1959, APC had no marketing program for investment castings made by the shell process. Sweeny, APC's Vice President for Sales, was specifically instructed not to solicit orders for production of such shell castings. Prior to 1960, APC turned down a substantial dollar amount of orders for large castings. A factor in APC's decision was that it could not make a profit from large castings if it had to put a great deal of money into experimentation. During the period 1957-1959, orders for large castings were frequently being solicited and accepted by APC's competitors and being satisfied by application of the Ceramic Shell technique. APC had been fairly successful using the Solid Mold method prior to 1959. APC had four plants in operation at the end of 1959. They were located in Tilton, New Hampshire, Groton, Connecticut, Brooklyn, New York, and Los Angeles, California. APC first heard that it might be able to acquire Alloy and Manufacturing when in 1957 a manufacturer's representative named Gregory reported this possibility to Sweeny. (Gregory represented both APC and Alloy because the two companies produced castings of different sizes.) At such *348 time Alloy was producing castings in its plant in Cleveland, Ohio, and Manufacturing at its plant in LaVerne, California, APC had no knowledge in 1957 as to the tax losses of either Alloy or Manufacturing. In view of the fact that Alloy and Manufacturing were producing much larger castings than APC, Sweeny asked Gregory to find out whether the two companies were available for acquisition by APC. In response, Floyd Odlum, head of Atlas Corporation ("Atlas"), which controlled Mercast (the parent of Alloy and Manufacturing) throughout the period 1955-1960, wrote Sweeny that Atlas was not interested in disposing of Alloy and Manufacturing. In about October 1959, Sweeny was again told by one of APC's manufacturer's representatives that Alloy and Manufacturing might be available for acquisition. Sweeny considered the opportunity appealing because these companies were making larger parts than APC and were successfully using the Ceramic Shell method which APC had been unable to perfect. Norris R. Lasher ("Lasher"), APC's secretary-treasurer, notified Wood of this acquisition possibility. Wood who was familiar with Alloy and Manufacturing but was unaware that they were losing money consistently, *349 instructed Lasher to explore the matter and to report back both as to the availability of the companies and the terms of acquisition. Lasher established contact with Atlas, [3] and several meetings 12 were held between representatives of Atlas and of APC during the months of 1959 to negotiate the acquisition of Alloy and Manufacturing by APC. APC was represented at such meetings principally by Wood and Lasher, and Atlas was represented by Hamilton K. Smith ("Smith"), a financial vice president of Atlas and a director of Mercast, and by Walter G. Clinchy, treasurer of Atlas. Smith was the one who had principal responsibility on the Atlas side for conducting and consummating the negotiations. At the first such meeting, APC expressed an interest in the acquisition of Alloy and Manufacturing and was told that the stock of the two companies was available for acquisition. The Atlas representatives requested financial information on APC. APC at the time had no financial information concerning Alloy and Manufacturing. APC's representatives did not know at that time that the two companies were being operated *350 at a loss. Smith deliberately delayed until after the second negotiating session with APC in presenting any such information to APC. Smith was concerned that the unfavorable operating results would discourage further negotiation. APC's representatives received from Atlas' representative, Smith, in late October or November, 1959, balance sheets (as of October 1959) of Manufacturing and Alloy, together with financial statements of earnings of the two companies (up to October 1959) with a forecast of earnings for the rest of 1959, and financial statements of earnings of Manufacturing and Alloy for previous years. In addition, APC's representatives were given a typed copy of the net operating losses of the two companies for the years 1955 to 1959, inclusive. APC's officers first became aware of the operating loss of Manufacturing and Alloy when they examined these documents. At that time, the representatives of Atlas also pointed out the benefits of a loss carryover. One officer of APC (Lasher) did not think that Manufacturing's LaVerne plant could be regenerated into such a profitable business as to make sufficient earnings to absorb the entire loss carryover of about $1,800,000. APC *351 had been, prior to December 1, 1959, a growth company for a number of years with improving earnings on an average. Its earnings for 1959 were the highest in its history. However, there was no assurance that the earnings of a surviving corporation following a merger could continue at the same rate as APC's since Alloy and Manufacturing had recently lost money and since the investment casting business can be cyclical in nature. Smith suggested that Matthieson, APC's chief technical officer, and Wood visit the LaVerne plant in November 1959. When they returned from LaVerne, Matthieson and Wood reported to APC's management that they observed an ability to produce castings substantially larger than those that APC had been able to produce, and they recommended proceeding with the acquisition in order to acquire this ability. Matthieson and Wood expressed concern as to the high costs of operation at LaVerne, the inadequate organization of management, possible overstatement of the book value of the assets, and the size of the operating losses being incurred. Wood and the other members of APC's management considered these continued heavy operating losses to be a serious deterrent to the acquisition *352 because APC did not have the financial resources to support the continuation of the losses. However, after inspecting the LaVerne plant of Manufacturing, Wood and Matthieson discussed the various improvements they thought should be made in operating the LaVerne plant and agreed that, while it was not certain, it was possible to make it into a profitable plant. APC thereafter expressed its continuing interest in Alloy and Manufacturing, and Smith arranged for the relevant financial information on these companies to be furnished to APC. Throughout the negotiations, the Atlas representatives insisted that APC acquire the stock or assets of both Alloy and Manufacturing so as to permit Atlas to get out of the investment casting business completely. Wood, APC's chairman of the board, at the negotiations with Atlas' representative, Smith, said that, while they were willing to trade stock, they would not accept the book value of the assets as a basis for determining price nor would they accept the intercompany liability of around $500,000 (owed by the subsidiaries to Mercast). The Atlas representatives asked that the acquisition price give effect to loss carryovers of Manufacturing and Alloy, *353 but the 13 final purchase price did not give any effect to the value of the losses. APC insisted on the acquisition price being determined solely with reference to the book values of Alloy, Manufacturing, and APC, since in the absence of a market for the stock of any of the three companies, no other basis of comparative valuation was available. Smith strenuously urged that, in arriving at the acquisition price, value should be ascribed to Alloy's and Manufacturing's tax losses, but APC refused to deal on that basis and did not consider the final acquisition price to give any effect to the value of such losses. APC's tax and legal counsel, Vincent H. Maloney ("Maloney"), advised the company against dealing on the basis that the tax losses of Alloy and Manufacturing had any value to APC. Maloney characterized the availabiilty of such losses as problematical and uncertain. [4] The directors and officers of APC discussed as a possibility the tax advantages of the net operating losses of Alloy and Manufacturing but did not actively seek to verify the amount of the tax losses in question. While no warranty or representation of correctness was made to APC with respect to the losses, the amounts *354 of these losses were stated in the certified annual reports of Alloy and Manufacturing. Wood discussed the possibility of the tax advantage from the loss carryovers with APC's tax and legal counsel, Maloney, and with the directors and officers of APC. Maloney recommended that the acquisition of Manufacturing and Alloy be carried out by a merger of Manufacturing into Alloy and of APC into Alloy. Among his reasons for recommending that the merger be carried out in this fashion were (1) he wished to preserve the license and APC's ability to use it; (2) he wished to employ the status of Alloy as a Delaware corporation; and (3) the arrangement would permit the use of the loss carryover if that loss should in fact ever be available to the resulting corporation. Wood was concerned about the large operating losses of Alloy and Manufacturing since APC would not have the financial resources to continue to operate at such a rate of heavy loss. This factor plus the overstatement *355 of book value of the assets of the companies were taken into account in determining the price bid for the companies. It was the understanding of the APC and Atlas negotiators that Manufacturing's sublicense under the Mercast license was limited and was not transferable if it ceased to be a subsidiary of Mercast and that Alloy's sublicense would remain in the corporate structure of Alloy even if the Company were no longer a subsidiary of Mercast. The APC negotiators concluded that in order for APC to acquire Alloy's sublicense, APC would have to obtain stock ownership of Alloy. The APC negotiators' understanding was that Mercast had bound itself contractually not to extend further Mercast process sublicenses. Furthermore, the Atlas negotiators were not interested in selling only part of the assets of the two companies but were seeking to get out of the investment casting business. The Atlas representatives insisted on stock being the consideration for acquisition of Alloy and Manufacturing since Atlas wished to have a continuing stock interest in the combined Alloy-Manufacturing-APC entity because of confidence in the entity's future management. APC did not offer to buy the empty Cleveland *356 building and land alone, but sought to obtain the stock in Alloy (which company owned the stock in the subsidiary holding title to the empty building). While Mercast would have been willing to sell the empty plant at Cleveland separately, there was no such willingness to sell the Mercast process by itself. APC's principal interest was in acquiring the Mercast process; its interest in the Cleveland facility was secondary and was based to an extent in the building being included in the total package offered. APC had been repeatedly told by its Midwestern customers and sales representatives, and its directors had recognized for some time prior to 1960, that a local plant in the Midwest was needed to increase the company's sales in that area. However, at the time of the merger, APC did not intend to utilize the Cleveland property immediately as an investment casting plant. It was thought that the plant could be used for future expansion. One of the factors in APC's acquisition of the Cleveland plant was Atlas' insistence that the plant be part of the entire arrangement. 14 On December 21, 1959, APC and Mercast agreed upon the basic principles applicable to the merger of APC, Alloy, and *357 Manufacturing. The merger was approved at a special meeting of the board of directors of APC held on December 21, 1959, by unanimous vote of the seven directors present, including Wood, Sweeny, and Lasher. On December 30, 1959, five individuals (Wood, Sweeny, Lasher, William I. Matthes, and M. F. Wendt), all of whom were directors of APC and in its employ, [5] owned in the aggregate approximately 66 2/3 of the outstanding stock of APC (Wood owning 53 percent of the APC common shares). They agreed they would vote their stock in favor of the merger. When the merger of Alloy, Manufacturing, and APC was being voted on at the directors' and stockholders' meetings called for that purpose, Wood, Lasher, and Sweeny did not base their votes on the value of the Alloy and Manufacturing tax losses. While there may have been some feeling among the key members of APC's management *358 that the market for APC stock would improve as a result of the merger, their major reason for going through with the acquisition was the acquisition of the Ceramic Shell know-how. The operating losses were not regarded as a positive factor. The merger was approved by the shareholders of APC by the unanimous vote of the attending holders of 94,991 shares of the 120,000 shares of common stock then outstanding. As a precondition to consummation of the acquisition, Mercast contributed to the capital of Alloy $441,491 by reducing from $751,491 to $310,000 the aggregate outstanding intercorporate indebtedness then due to it. It was further agreed that Mercast would reduce such $310,000 of remaining indebtedness by various contingent amounts, including so much of any operating losses in excess of $7,000 determined to have been incurred by Manufacturing during December 1959. Upon settlement of adjustments in May 1961, the indebtedness of $310,000 was decreased by a total of $122,160, of which $14,215 represented the excess of Manufacturing's operating loss for December 1959, above $7,000. Pursuant to the merger terms, the consolidated corporation was to be Alloy, with its name changed to Arwood *359 Corporation (Arwood) and the holders of 16,000 shares of the 5 1/2 percent cumulative preferred stock (par value $25) of APC received in exchange therefor 16,000 shares of Arwood's 5 1/2 percent cumulative preferred stock (par value $25). In addition, 150,000 shares of the voting common stock (no par value) of Arwood (i. e., 20 percent of such stock) were issued to Mercast and 600,000 such shares (i. e., 80 percent of such stock) were issued to the holders of APC's stock (no par value) then outstanding. Also, under the agreement, there was a reduction of the minimum royalties payable by Alloy to Mercast pursuant to Alloy's sublicense under the Kohl patent from $25,000 a year to $1,000 a year. On the merger of Manufacturing into Alloy[6] *360 on December 31, 1959, Alloy issued five new shares of $100 par value common stock to its parent Mercast in exchange for all of its then outstanding stock of all classes and five new shares of $100 par value common stock to Mercast in exchange for all the outstanding stock of Manufacturing. APC merged into Alloy on January 5, 1960. The book net worth of Manufacturing as of December 31, 1958, was computed to be approximately $517,000 while the book net worth of Alloy was computed to be approximately $186,000. Upon the merger of APC, Manufacturing, and Alloy, Alloy was the surviving corporation bearing the name Arwood Corporation ("Arwood"), the petitioner herein. Immediately upon consummation of the merger, the net assets of Arwood had a book value of $2,461,572, of which $883,301 (i. e., 36 percent thereof) was attributable to the aggregate net assets of Alloy and Manufacturing, and $1,578,271 (i. e., 64 percent thereof) was attributable to the net assets of APC. Starting in January 1960, Arwood sent its chief engineers from its plants and from its research and development group to LaVerne to familiarize themselves with the 15 Mercast process and techniques employed there. On January 5, 1960, Sweeny reported to the board of directors of Arwood that APC's research efforts dealing with a shell process were not yet completed and that tests were being conducted. Sweeny was not then aware that the Ceramic Shell process acquired from Alloy and Manufacturing would prove to be compatible *361 with APC's casting method. Shortly after the merger, Arwood had Sweeny, who was then its Executive Vice President, spend one out of every three weeks at the LaVerne plant, reorganizing its operations and making changes in its personnel. These changes were made by Arwood in the belief that the operating losses incurred previously reflected improper marketing of the capacity to produce large castings, poor cost controls, and inadequacy and lack of technical expertise among the top management. In addition, Arwood conducted sales meetings at which its salesmen were informed that, as a result of the acquisition of Alloy and Manufacturing, Arwood had obtained the ability to produce much larger castings. The salesmen were told to commence the solicitation of large castings. During 1960, Arwood's sales personnel constantly went to LaVerne to familiarize themselves with the Mercast techniques and with the capacities of the Mercast process. [7]
Arwood proceeded to invest during 1960 some $230,000 in additional buildings and equipment at the LaVerne plant. [8] *362 An announcement was issued on January 5, 1960, to APC's customers in which they were advised of the merger. The announcement stated that Arwood would be producing parts "using the conventional investment casting process, the newly developed shell process and the patented mercury process." The announcement further stated with Arwood's foundries in Tilton, New Hampshire, Groton, Connecticut, Brooklyn, New York, and Los Angeles, California, would produce "conventional investment and shell castings" and that Arwood's foundry in LaVerne, California, would produce "frozen mercury and shell castings." In APC's annual report to its stockholders for the year 1959, issued during 1960, it was stated that "Ceramic Shell casting process, successfully developed at Groton & Tilton plants, permits production of much larger parts." These statements and other statements [9] concerning the Ceramic Shell technique in fact exaggerated both the role of APC in the development of the process and APC's production capabilities *363 at the time of the merger. The thrust of the Arwood public relations effort was to make it appear to APC's customers and potential customers, as well as to its shareholders and the rest of the industry, that Arwood was not behind in the investment casting field in its research and development and that the company was not just beginning to use techniques that its competitors had been using for some time. As a result, Arwood issued public statements in which it was indicated that APC was the developer of the new process and in which it was suggested that the integration of the Shell and Lost-Wax methods was an accomplished fact. In truth, APC had not perfected the Ceramic Shell method prior to the merger and did not have the ability to use that method in conjunction with its Lost-Wax procedure until many months after the merger. At the time of the merger, APC had been aware that the Mercast process was more expensive than the Lost-Wax *364 Solid Mold method and that the Mercast process would prove to be beneficial for the most part when it was necessary to produce large or thin castings. The reason the use of wax was far cheaper than the use of frozen mercury was that the mercury system required great quantities of dry ice and elaborate mechanical refrigeration to bring the mercury down to freezing temperature. In addition, solidification required considerably more time in the case of mercury than in the case of wax. While the APC management had been aware, during the negotiations, that the mercury system entailed a somewhat greater expense, they did not have detailed knowledge of the specific technical problems its use would present. APC had never used the frozen mercury technique. 16 The efforts, during 1960, of Arwood's engineers to employ the LaVerne shell formulation at Arwood's other plants were successful. The engineers discovered that the Ceramic Shell method could be used in a manner compatible with Arwood's Lost-Wax system. The APC management had not known of this compatibility when they were negotiating with Atlas. While later they were to anticipate that a Lost-Wax Ceramic Shell method could be developed *365 by the engineers, it was in fact not until approximately August of 1960 that Arwood was able to discontinue the use of mercury and adapt its Lost-Wax process to the Ceramic Shell technique acquired in the merger. By the end of 1960, as a direct result of having acquired the data on the Ceramic Shell method in the merger, Arwood could manufacture investment castings greater than 24 inches in size and weighing up to 100 pounds. If there had been no merger, APC would not have had the capability at that time to produce such parts. In 1959, APC had no production sales of castings made by the Ceramic Shell process. In 1960, Arwood's sales of castings by the shell method amounted to $910,405 (of which $357,879 represented sales of castings made by the use of frozen mercury), as compared with total sales in 1960 of $10,616,529. Within about three months after the merger, Arwood negotiated a lease of the front portion of the empty Cleveland building. In May 1960, the board of directors of Arwood considered renting the back portion of the building with an option to the lessee to buy the entire property after three years. In June 1960, the Board concluded that work had to be done on the rear *366 portion of the Cleveland property, including the tearing down of a wall and the leveling of the floor, to put it in rentable condition. A vice president was authorized to obtain estimates on the cost of the work involved. In August 1960, the Board was still trying to negotiate a lease for the entire Cleveland building. In June 1960, Arwood hired Frederick W. Dischinger as its Midwesters sales manager. Arwood conducted a sales conference in November 1960, in Cleveland for its midwestern sales representatives to inform them of its plans to reactivate the Cleveland plant. Included in the conference agenda was a visit to that plant. In June 1960, the board of directors of APC decided that, because of the losses incurred in both the Los Angeles and LaVerne plants, the market should be surveyed to determine whether the volume of business was high enough to maintain both plants or whether the two plants should be consolidated. In August 1960, after the survey, the Board took no action except to decide to reconsider the matter before the end of 1960. In May 1961, Arwood's business increased sufficiently to warrant the board of directors to discuss the need for expansion. A committee was appointed *367 by the Board to determine whether the existing plants of the company should be expanded or whether to equip the empty Cleveland building. In June 1961, the committee reported that it was inadvisable to expand the existing plants since their locations could not accommodate the additional space and production facilities needed. They recommended the activation of the Cleveland building because it was near the greatest market potential. It was not until July 1961, that Arwood's board of directors determined to utilize the Cleveland property as an investment casting plant by equipping it with the necessary machinery. In 1961, Arwood's board of directors approved a plan for public financing of the reactivation of the Cleveland facility. The plan was effectuated by a public sale of Arwood stock in May 1962. The public sale generated some $675,000 for Arwood, which utilized these funds as part of a total of $1,500,000 invested by it during the 1962-1965 period in the Cleveland facility. The Cleveland facility went into operation in May 1962, and became consistently profitable for the first time in about September 1963. As a result of the activation of the Cleveland facility, Arwood's midwestern *368 sales increased. The Kohl patent and the licenses and sublicenses thereunder expired in May 1963, 17 years after the issuance of the patent on May 21, 1946. APC's and Arwood's business at all relevant times was cyclical in nature. Over the ten-year period ending December 31, 1959, APC's annual sales increased from $2,970,105 to $8,427,456, and its annual net profits increased from $82,500 to $619,898. APC's net income in 1956 was approximately $542,000; in 1957, it was approximately $181,000. 17 The listing below contains the net sales and pre-tax net income of APC and Arwood for the period 1958-1965: Year
Net Sales
Net Pre-taxIncome
1958
$ 6,299,396
$ 197,566
1959
8,427,456
619,898
1960
10,616,529
543,596
1961
11,784,306
789,361
1962
11,630,173
156,183
1963
12,005,486
360,514
1964
11,183,985
614,555
1965
13,110,408
787,830
In connection with the net operating loss carryovers, the petitioner deducted the following amounts in its returns for the years 1960-1964: Year of Deduction
Amount
1960
$1,874,641.48
1961
1,300,622.19
1962
516,446.95
1963
391,555.97
1964
37,566.77
In his statutory notice of deficiency (covering the taxable years 1960 - 1962), dated January 28, 1966, and in his statutory notice of deficiency (covering *369 the taxable years 1963-1965), dated December 15, 1967, the respondent disallowed the petitioner's deduction of the net operating loss carryovers of Alloy and Manufacturing "in accordance with the provisions of section 269 of the Internal Revenue Code of 1954." In its petition filed with the Court on April 18, 1966, relating to the years 1960-1962, the petitioner listed, as a basis for its carryovers during the years at issue, the operating losses of Alloy and Manufacturing for the years 1955-1959. The petitioner's figures are as follows: Year
Alloy
Manufacturing
1955
$ 8,175.36
$111,943.64
1956
396,400.56
145,901.64
1957
366,939.55
244,808.18
1958
346,067.22
216,838.56
1959 17,011.68
20,555.09
$1,134,594.37
$740,047.11
In his answer filed with the Court on June 15, 1966, the In his answer filed with the Court on June 15, 1966, the respondent admitted the petitioner's allegations as to the amounts of the operating losses. The petition covering the years 1960-1962 was assigned Docket No. 1917-66, and the petition covering the years 1963-1965 (filed December 26, 1967) was assigned Docket No. 6476-67. On April 26, 1968, we granted the petitioner's motion for consolidation of the two cases. On November 15, *370 1968, the respondent filed with the Court a motion for leave to file an amendment to his answer in Docket No. 1917-66. His counsel stated that the amendment was sought so that respondent could show at trial that $70,000 of the claimed net operating losses were not allowable. We granted his motion after a hearing, attended by representatives of both parties, on December 2, 1968. In his amendment, the respondent, among other things, denied the petitioner's allegations of the amounts of the operating losses of Alloy and Manufacturing (which amounts he had earlier admitted). At the end of the trial of the instant case, the respondent offered to stipulate the amounts of the net operating losses in question pursuant to the following schedule which he placed in evidence: Year
Alloy
Manufacturing
1955
$117,104.25
1956
$ 399,418.09
145,898.86
1957
333,979.61
222,282.23
1958
333,922.51
215,834.67
1959 17,010.23
20,556.54
$1,084,330.44
$721,676.55
The person who prepared the schedule did not appear at trial, and no testimony or other evidence was offered by the respondent to substantiate the figures appearing on the schedule. Petitioner declined to so stipulate and objected to introduction of the schedule as an *371 exhibit, on the ground, inter alia, that the preparer of the exhibit was not available for cross examination. Respondent conceded that petitioner was entitled to at least the amounts of net operating losses reflected in the schedule, but urged that unless the evidence of record would support additional amounts no such amounts should be permitted if petitioner prevailed. The exhibit was admitted. APC, Alloy, and Manufacturing, at all relevant times, valued their inventories at the lower of cost or market. The principal elements of cost in the investment casting business are materials, direct labor, variable expenses which vary directly with the manufacturing process, factory fixed overhead, and administrative expenses. Alloy and Manufacturing had consistently determined the cost of work-in-process by the full cost absorption method, that is, by including in its computation the cost of raw materials and supplies entering into and consumed in connection with the products, expenditures for direct labor, and indirect expenses incident to the production of the particular article (a reasonable proportion of overhead and management expenses). 18 Accordingly, the December 31, 1959 closing *372 work-in-process inventory of Alloy included expenditures for direct labor and overhead and management expenses. At all relevant times, APC had consistently followed the so-called prime cost method of including in work-in-process only the cost of raw materials and supplies and expensing direct labor and all other overhead and manufacturing expenses related thereto. Consequently, APC's closing inventory on December 31, 1959, and the addition to Alloy's inventory on January 5, 1960, for inventory acquired from APC (based on APC's December 31, 1959 inventory) included only the cost of raw materials and supplies and excluded all other expenses. The petitioner included in its closing inventory on December 31, 1960, only the cost of raw materials and supplies in work-in-process, irrespective of whether such work related to Alloy or APC, and expensed direct labor expenses and overhead and management expenses relating to work-in-process. Arwood continued this practice in the years 1961 through 1965, inclusive. At the beginning of 1960, the petitioner's work-in-process inventory included work-in-process of Alloy valued at $86,902.83 (full cost absorption method) and work-in-process acquired *373 from APC valued at $52,841.66 (prime cost method), this latter figure representing APC's basis in its work-in-process inventory at the time of the merger. The respondent, in making his determination of a deficiency, valued the work-in-process which the petitioner acquired from APC at $279,841.66, pursuant to the full cost absorption method. The petitioner used the prime cost method to value its closing 1960 work-in-process inventory at $65,013. The respondent, in making his deficiency determination, valued this inventory under the full cost absorption method at $468,013. The respondent's calculation under the full cost absorption method increased the petitioner's taxable income in 1960 by $176,000. The applicable direct labor and overhead and manufacturing expenses not included in APC's work-in-process inventory were as follows during the indicated periods: Years prior to January 31, 1954 [10] *374 $122,000
Years 1954-1959, inclusive 105,000
Total for years prior to 1960
[11] $227,000 At the time of the public offering of its stock in 1962, the petitioner was required by the Securities and Exchange Commission to report its income by including in work-in-process, the applicable direct labor and overhead *375 and manufacturing expenses. Pursuant to this use of the full cost absorption method, the petitioner's income for 1960 was increased by $403,000 (which figure included $176,000 [the 1960 addition under the full cost absorption method] and $227,000 [the adjustment for years prior to 1960]). This amount, however, was not included in the petitioner's Federal income tax return. The examining agent for the Revenue Service increased Arwood's closing work-in-process inventory as of December 31, 1960, by $281,000, reducing the $403,000 adjustment required by the Securities and Exchange Commission by $122,000, the amount of applicable direct labor and overhead and manufacturing expenses not included in work-in-process prior to January 1, 1954. However, the statutory notice followed the adjustment made by the Securities and Exchange Commission and included the $122,000 figure, thereby increasing the 1960 inventory adjustment to $403,000. In the taxable years 1961 to 1965, the petitioner valued its opening and closing work-in-process inventory under the prime cost method. The respondent, in making his determination of a deficiency, valued the opening and closing work-in-process inventory under *376 the full cost absorption method. The pertinent figures are listed in the chart below: 19 ARWOOD CORPORATION WORK-IN-PROCESS INVENTORY *13
OPENING INVENTORY
CLOSING INVENTORY
Year
Prime Cost
Full CostAbsorption
prime Cost
Full CostAbsorption
Increase (Decrease)To Taxable IncomeUnder Respondent'sMethod
1961
$ 65,013
$468,013
$ 70,499
$ 559,999
$ 86,500
1962
70,499
559,999
115,847
753,999
148,652
1963
115,847
753,999
83,917
707,853
(14,216)
1964
83,917
707,853
97,695
707,312
(14,319)
1965
97,695
707,312
144,102.13
1,014,433
260,713.87
In his statutory notice dated January 28, 1966, relating to the taxable years 1960-1962, the respondent increased the petitioner's income by the amounts appearing below: 1960
$403,000
1961
86,500
1962
148,652 for the reason that the petitioner's "closing inventory for those years were understated by the respective amounts." In his statutory notice, dated December 15, 1967, relating to the taxable years 1963-1965, the respondent decreased the petitioner's income for the years 1963 and 1964 by the amounts appearing below: 1963
$14,216
1964
14,319 and increased the petitioner's income for the year 1965 by the amount appearing below: 1965
$260,713.87 "due to the [petitioner's] understatement of [its] opening *377 and closing inventories for the years 1963, 1964, and 1965." Ultimate Findings of Fact The merger of APC, Alloy and Manufacturing was not motivated by a desire on the part of the APC management to benefit from the net operating losses of Alloy and Manufacturing and therefore did not have as its principal purpose the evasion or avoidance of income tax. The full cost absorption method of valuing the petitioner's work-in-process inventory, and not the prime cost method, [12] clearly reflected the petitioner's income during the years 1960-1965. Opinion The first issue for our consideration involves the question of whether the petitioner, Arwood Corporation, may carry over to its income tax returns for the years 1960 through *378 1964 the net operating losses of Alloy and Manufacturing incurred prior to the merger of the three corporations. The respondent claims that the petitioner is not entitled to benefit from these losses because he believes that there was no business purpose for the merger of the companies and that, even if there were such a purpose, the tax avoidance motives for the merger exceeded in importance any business purpose that may have existed. The respondent relies on section 269[13] to support his determination. The petitioner argues that the merger was not occasioned by any desire to obtain tax losses but instead grew out of a need on the part of APC to obtain necessary technical information concerning processes used in the investment casting business. Accordingly, the petitioner contends that the merger was arranged principally for business purposes. Section 269(a) provides that if - * * * any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly, or indirectly, immediately before such acquisition, by such *379 acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such 20 acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such * * * corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. * * * Section 269(c) provides that where the corporation is acquired for a purchase price which is "substantially disproportionate" to the total of the adjusted basis of the property of the corporation and the tax benefits acquired, then such fact "shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. [14]
Whether or not the principal purpose for a given acquisition under section 269(a) is the evasion or avoidance of income tax is essentially a question of fact, and each case must necessarily be decided on its own merits. Clarksdale Rubber Co., 45 T.C. 234 (1965); *380 Elko Realty Co., 29 T.C. 1012 (1958), affd. per curiam 260 F. 2d 949 (C.A. 3, 1958); Frank Spingolo Warehouse Co., 37 T.C. 1 (1961); section 1.269-3(a), Income Tax Regs. We believe, on the facts presently before us, that the merger of APC, Alloy, and Manufacturing was motivated principally by business considerations, and we have therefore concluded that this is not a proper case for the application of section 269. In 1953, APC, after 10 years in the business of manufacturing industrial parts by the Lost-Wax Solid Mold method of investment casting, was unable to manufacture parts which were larger than one inch in any dimension and which weighed more than one ounce. The management of APC knew about the Ceramic Shell method of casting used in connection with the Mercast process, which at the time was being utilized by Alloy to produce parts that were of a size far beyond APC's capacity. APC attempted to develop its own shell process by instituting in 1953 an internal program of laboratory research. By 1957, APC was not yet successful in its research efforts. In that year, Sweeny, APC's Vice President for Sales, was advised by a sales representative that APC might be able to acquire Alloy *381 and Manufacturing. Sweeny was aware of the production capabilities of the two companies, and he looked favorably upon such an acquisition. Sweeny was not then aware of the operating losses of Alloy and Manufacturing. Sweeny was subsequently advised that the two companies were not available for acquisition. APC continued its efforts to produce a shell system of casting. In 1958, APC attempted to obtain data on a shell process from Met-Ceram, Inc., but the license acquired from Met-Ceram proved useless to APC, and it was eventually canceled. APC's internal efforts remained at the experimental stage, and the company was unable to accept or solicit orders for large castings. Customers for such castings would place their orders with other companies. In 1959, APC was again advised that Alloy and Manufacturing might be available for acquisition. Wood and Lasher, the officers of APC who were to become involved in negotiations with Atlas Corporation, had no knowledge, initially, about the losses in question. They knew that APC had been unsuccessful in its attempts to perfect a shell process like the one used by Alloy and Manufacturing, and they felt that acquisition of the Ceramic Shell process *382 would expedite APC's capacity to produce large parts. In order to acquire the requisite data on the shell process, the officers of APC understood that it would be necessary for them to purchase the stock of the two companies since Atlas was desirous of getting Mercast out of the investment casting business and was unwilling to sell the technical data separately. APC's representatives did not become aware of the operating losses of Alloy and Manufacturing until the second negotiating conference with the representatives of Atlas. When APC's management learned of the losses, they became very concerned whether APC's financial resources were sufficient to permit it to reverse these losses. Wood and other members of APC's management considered the heavy operating losses to be a serious deterrent to the acquisition. Wood and Matthieson went to see the LaVerne plant of Manufacturing to observe its operations and its capacity to produce large parts under the Mercast process. They discussed improvements that could be made there and agreed that it was possible to make the plant operate at a profit. 21 Smith, the principal negotiator for Atlas, constantly emphasized to the APC representatives *383 the tax advantages of the operating losses. However, APC's tax and legal counsel, Maloney, advised APC against negotiating on the basis that the tax losses had any potential benefit to APC. He insisted that the acquisition price be arrived at without regard to the losses. Although he was later to change his opinion, Maloney believed that the possibility of carrying over the losses was at best problematical. His advice was followed by the APC negotiators, and they took no affirmative action to verify the amounts of Alloy's and Manufacturing's operating losses. The final price gave no effect to the value of the losses. [15]
As part of the merger agreement, Mercast reduced the indebtedness of Alloy and Manufacturing (to Mercast) by $14,215 to reflect December 1959 operating losses of Manufacturing exceeding $7,000. This would seem to suggest that if any amount was paid for the losses in question, it was Mercast which made the payment to APC. The key members of the APC management, comprising a majority of the votes cast in favor of acquisition, felt that various factors favored going ahead with the merger. None of them believed *384 that the operating losses were a positive consideration. While there may have been some thought given to enlarging the public market for APC stock, the major attraction to the management was the early acquisition of the capacity to produce large casting by the Ceramic Shell method. Upon consummation of the acquisition, all of APC's chief engineers went to LaVerne to familiarize themselves with the processes used in the plant to produce large castings. Later, the efforts of these engineers resulted in their discovering the compatibility of the Ceramic Shell technique employed at LaVerne with APC's Lost-Wax method. Eventually, Arwood replaced the expensive frozen mercury method with APC's wax procedures, and Arwood produced its castings under the integrated Lost-Wax Ceramic Shell method. Sweeny, who became Arwood's Executive Vice President, spent every third week during 1960 supervising the reorganization of the LaVerne operation. Many members of the former APC sales staff were sent to LaVerne to become familiar with the newly obtained production capabilities. A total of $230,000 was invested in the buildings and equipment at LaVerne. By the end of the year 1960, Arwood was able to produce *385 intricate castings greater than 24 inches in size and weighing up to 100 pounds. If there had been no merger and APC had not acquired the Ceramic Shell data from Alloy and Manufacturing, APC would not have been capable at the end of 1960 of producing parts of that size and weight. It seems clear that all of the factors discussed above are inconsistent with the respondent's contention that the merger of the three companies took place in order to achieve the acquisition of tax losses. We believe that the record strongly establishes that the principal purpose for the purchase of Alloy and Manufacturing was the acquisition by APC of the ability to produce large castings. We have carefully considered the respondent's request for findings of fact and the interpretation which he gives to the evidence of record. The respondent believes that there is some confusion in the record as to exactly what know-how APC obtained from Alloy and Manufacturing. We do not share that confusion. APC acquired information on the Mercast process of investment casting. This process included patents and trade secrets dealing with the use of frozen mercury and the related Ceramic Shell technique. Alloy and Manufacturing *386 had used the patents and trade secrets to produce large investment castings, and this ability was acquired by APC as a result of the merger. It seems clear to us that APC needed this technical information, which it was unable to develop by itself, and that the principal purpose of the merger was the acquisition of such know-how. The respondent claims that, because APC had been achieving financial success producing small parts, the company had no real need to acquire the ability to make larger parts. Inconsistently, the respondent further asserts that APC had already developed the capacity to produce large castings at the time of the merger and did not need the technical information it acquired from Alloy and Manufacturing. Our findings show that APC's inability to produce large industrial castings prevented the company from soliciting or 22 accepting orders for such parts. Because other investment casting companies had such a capability, APC began a research program in 1953 to enable it to be on an equal footing with its competitors. APC found that it was able to produce some large parts on a research basis and made some boastful public statements about its accomplishments, but in *387 fact the company was not able to perfect a Ceramic Shell process for producing large castings. It was not until the acquisition of Alloy and Manufacturing took place that large parts could be manufactured (than by Arwood) on a regular basis. We are aware of the statements that were made in the announcement to APC's customers, dated January 5, 1960, and in APC's annual report for 1959, as well as in certain of Arwood's press releases. These public statements suggest that APC had independently developed the Ceramic Shell method at its own plants. However, we have found the testimony offered on behalf of the petitioner in this connection to be credible and convincing, and we have concluded that these statements amounted to a public relations effort to assure APC's customers and potential customers that APC was keeping pace with the rest of the industry. The fact remains that, despite more positive assertions to the contrary, APC had not perfected its own Ceramic Shell method at the time of the merger. APC, in its January 5, 1960 announcement overstated its capacity at that time in the probable expectation that Arwood's research efforts would quickly give the company the production capability *388 described in the release. The APC annual report and the press releases issued by Arwood were, in our view in the nature of "puffing" since Arwood did not want it to appear that it was very much behind its competitors in the development of new techniques. We are satisfied from a careful scrutiny of the entire record that APC (and Arwood) overstated APC's progress in developing a Ceramic Shell method and that the acquisition of Alloy and Manufacturing was the critical factor in the development of a shell method capable of being used in conjunction with APC's Lost-Wax procedure. In an attempt to show that the merger was not arranged for business purposes, the respondent points to the fact that APC did not need or have any use for Alloy's plant at Cleveland. We agree that APC had no immediate plans for the Cleveland building, but we think the record makes it clear that APC could not acquire the technical information (involving patents and secret processes) alone and that APC was required to acquire the stock in the business entities themselves. As a result, APC was unable to turn down the Cleveland plant because it was part of the total package offered by Atlas (which company wanted Mercast *389 to get out of the investment casting business). In any event, it was anticipated by the APC management at the time of the merger that the plant could be utilized for future expansion. The respondent also suggests that APC had no real concern that APC's earnings would be able to absorb the losses of Alloy and Manufacturing. It appears to us that this fear had a basis in reason since the investment casting business can be cyclical in nature and since Manufacturing's losses would have to be included in the computation of Arwood's income for the year 1960 and the following years. The concern of APC's management in this regard was reasonable in 1959 and is another factor which convinces us that they did not arrange a merger of the three companies merely to benefit from the net operating losses. On brief, the respondent observes that "[the] deal was meticulously tailored to insure that the stockholders of APC would reap the benefits from the carryovers." The respondent argues that since the method chosen to accomplish the merging of the three companies was one which permitted a carryover of the operating losses, it follows that APC's primary motivation for the merger was the reduction of *390 its taxes. We do not believe that, whenever the method chosen in a given case to effect an acquisition is one which assures favorable tax results, we must necessarily conclude that the principal purpose of the transaction is tax avoidance. The merger in the instant case was designed to permit the deduction of the carryovers, in the event that such deduction would prove to be permissible. We think that arranging the merger in a manner that produces the most favorable tax results is simply intelligent business planning. It must be remembered that section 269 addresses itself to a situation where the principal purpose of the acquisition is tax avoidance; in the present case only the method selected for 23 effecting the acquisition was motivated to some extent by tax considerations. APC's tax and legal counsel felt that the carryover of the losses was in doubt, but he recommended that the companies be merged in order to (among other reasons) enable the combined entity to take any loss deduction that could possibly be available. While in some instances the method of acquisition employed by the parties may suggest an intent to avoid tax, we do not believe that on the facts of the instant *391 case such an intent existed. APC was principally seeking technical know-how, and the company was unable to purchase the requisite data by itself. APC found that in order for it to obtain the technical information, it would have to acquire the business entities of Alloy and Manufacturing. The fact that a merger was arranged and effected in a manner which would permit deduction of the losses is indicative of nothing more than what is readily admitted by the petitioner - that APC sought and followed competent legal advice. See Berland's Inc. of South Bend, 16 T.C. 182, 188 (1951). Even if some tax avoidance motivation could be attributed to the APC management by virtue of the method they chose to create the combined entity, the record does not permit us to find that any such desire to receive tax benefits by the APC officers was more than incidental to their principal purpose for the transaction. The respondent makes the observation that there was no business purpose for the merger of Manufacturing into Alloy. We do not believe that the breaking of the APC-Alloy-Manufacturing merger down into its component parts serves any useful purpose. In section 1.269-3(a)(2), Income Tax Regs., it *392 is stated: The determination of the purpose for which an acquisition was made requires a scrutiny of the entire circumstances in which the transaction or course of conduct occurred, in connection with the tax result claimed to arise therefrom. * * * We have looked at the entire transaction and have concluded that, even though the means by which the merger was accomplished shows that tax factors were taken into consideration, the principal motivation or primary purpose of the whole arrangement was not the evasion or avoidance of income tax. The dissecting of the transaction, in our opinion, would serve only to give undue significance to the method the parties chose to accomplish the acquisitions in question. As we have indicated above, the method employed to effect a merger is but one factor to be considered in making a determination of "principal purpose" under section 269. The respondent cites section 269(c) and argues that, under the subsection, further weight is given to the presumption of correctness already arising from the Commissioner's determination. Section 269(c) imposes a presumption of tax avoidance where the amount paid for stock is substantially disproportionate to the *393 aggregate of the adjusted basis of the corporate property and the tax benefits that would not have been available were it not for the acquisition. Congress intended this subsection to be applicable where the amount paid is less than the value of the corporate assets and tax benefits. H.F. Ramsey Co., 43 T.C. 500, 517 (1965). The petitioner concedes that in the instant case the acquisition price paid by APC (20 percent of the common stock of the combined entity - Arwood) was substantially less than the sum of the adjusted basis of the property of Alloy and Manufacturing acquired in the exchange and of the tax benefits inherent in the net operating loss carryovers. It would appear that a presumption of tax avoidance would be more appropriate where the amount paid is more than the value of the assets, thus indicating that something was paid for the loss deduction. Even the respondent suggests on brief that the application of section 269(c) presumption to a case like the instant one may be "illogical." Fortunately, section 269(c) does not provide a conclusive presumption; the legislative history indicates that the presumption is merely a "procedural device." Industrial Suppliers, Inc., 50 T.C. 635, 646 (1968); *394 H.F. Ramsey Co., supra at page 517. [16]
The basic question in this case is essentially factual and, even assuming that the respondent's determination is to be given great weight, the evidence before us is such that we regard the petitioner as having satisfactorily met its burden of proof. See 24 Baton Rouge Supply Co., 36 T.C. 1, 13 (1961). In a footnote in his brief, the respondent states that "no part of the loss claimed to have been incurred by Alloy after it ceased operations in November 1958 would qualify as [a] net operating loss within the meaning of section 172" and therefore could not be carried forward by Arwood. The respondent believes that this result should follow from the fact that Alloy closed down its Cleveland plant in November of 1958, and he cites as support Winter & Co. (Indiana), 13 T.C. 108, 119 (1949), and Anbaco-Emig Corp., 49 T.C. 100 (1967). The respondent apparently feels that after that date, Alloy became "de facto dissolved" and could not have an operating loss. We pointed out in the Anbaco-Emig case *395 that the "de facto dissolution" theory had proper application only in the excess profits tax area and not in the income tax net operating loss area. We see nothing unique in the present case which would cause us to change our view. As we said in Anbaco-Emig (at page 107), "we are as resistant now as we were in the Acampo case to read a limitation into the statute which is not there as an express limitation." See also Joseph Weidenhoff, Inc., 32 T.C. 122, 1234-1235 (1959). One additional matter remains to be resolved in connection with the section 269 issue in this case; the precise amount of the net operating losses incurred by Alloy and Manufacturing in the years 1955 through 1959. In his answer the respondent admitted the allegation in the petition that the losses were as follows: Year
Alloy
Manufacturing
1955
$ 8,175.36
$ 111,943.64
1956
396,400.56
145,901.64
1957
366,939.55
244,808.18
1958
346,067.22
216,838.56
1959
17,011.68
20,555.09
However, on December 2, 1968, just a few days before the start of the trial, over two years thereafter, the respondent amended his answer, with leave of Court, to put the amount of these losses at issue in the case. In his statutory notice to the petitioner, dated *396 January 28, 1966, the respondent had disallowed the petitioner's deduction of the loss carryovers "in accordance with the provisions of section 269," and no reference was made therein to a denial of the deductions based on any failure by the petitioner to substantiate the amounts of the losses. As a result, the petitioner believes that the burden of proof as to this question is on the respondent and that the amounts listed in the petition must be accepted by the Court unless the respondent has shown them to be inaccurate. The petitioner contends it does not have the burden on this question because the substantiation issue constitutes a new matter raised by the respondent in his answer. We agree. The general rule as to burden of proof is stated succinctly in Rule 32 of the Rules of Practice of this Court: The burden of proof shall be upon the petitioner, except as otherwise provided by statute, and except that in respect of any new matter pleaded in his answer, it shall be upon the respondent. In those instances when the Commissioner raises an issue affirmatively in his answer and the original basis for his determination is not broad enough to include the new ground thus raised, the *397 presumptive correctness of the original determination does not extend to the new matter. Arthur Sorin, 29 T.C. 959, 969 (1958), affd. per curiam 271 F. 2d 741 (C.A. 2, 1959). To place the burden on the Government, the new issue must be one which does more than merely make the original determination more specific. Rozelle McSpadden, 50 T.C. 478, 493 (1968). The Commissioner has the burden of proof as to issues raised in his answer which are based upon new theories different from and inconsistent with the theory employed in his statutory notice. Sheldon Tauber, 24 T.C. 179, 185 (1955). In the instant case, the statutory notice, in denying the loss deductions, did not disclose that the respondent's determination was based on the petitioner's failure to substantiate the operating losses of Alloy and Manufacturing; it stated only that the deductions were being denied in accordance with the provisions of section 269. While the language of the deficiency notice is broad and arguably might be construed in certain situations to encompass a substantiation requirement, [17] we believe that the record in the present case clearly shows that the respondent intended by this 25 language not to place *398 the amounts of the operating losses at issue. The respondent communicated this intention to the petitioner in his answer filed on January 15, 1966, wherein he admitted that the losses in question were accurately listed in the petition. Since the respondent regarded the petitioner's allegations concerning the losses as correct when he prepared his statutory notice, it follows that several years later when he amended his answer to deny these allegations, he thereby raised an issue which was different from and inconsistent with the theory he employed in making his original determination. Respondent recognized this in his argument made at eve of trial by stating quite directly that all he sought by asking leave of Court to permit the eleventh hour amendment to his answer was the opportunity to establish at trial that some $70,000 of the claimed losses were not allowable. We conclude that the respondent's filing of an amendment to his answer shortly before trial placed at issue a "new matter," within the purview of Rule 32. We therefore hold that the burden of proof on this issue rested with the respondent. He has not sustained it. At *399 trial, the respondent submitted an exhibit, listing amounts which he believes properly reflect the operating losses of Alloy and Manufacturing during the years 1955-1959. However, he offered no evidence of any kind to establish the validity of his figures. In view of this fact, we must hold that he has failed in his burden of proof and that the loss figures provided by the petitioner accurately represent the net operating losses of the two companies during 1955-1959. The respondent raised an additional argument in his opening statement, relating to Mercast's 1960 income tax return, which he did not mention on brief. We assume that the respondent has withdrawn the argument, and we do not discuss it. We conclude that the petitioner was entitled to the deductions it took during the years 1960-1964 in connection with the carryover of the net operating losses of Alloy and Manufacturing. The petitioner has established by a preponderance of the evidence that a tax evasion or avoidance purpose did not exceed in importance any other purpose. Southern Dredging Corporation, 54 T.C. 705, 718 (1970); Commodores Point Terminal Corporation, 11 T.C. 411, 418 (1948). We hold that the respondent erred *400 in disallowing these deductions. The second issue for our consideration in this case involves the petitioner's method for valuing its closing work-in-process inventory. The respondent has determined that the petitioner understated its closing inventories for the years 1960-1965 through its use of the prime cost method of inventory valuation. Under the prime cost method, only the petitioner's cost of raw materials and supplies were included in its work-in-process - and not overhead and manufacturing expenses related thereto. The respondent argues that the full cost absorption method should have been used by the petitioner. Under this method, direct labor expenses [18] *401 and indirect expenses (a reasonable proportion of overhead and management expenses), as well as the cost of raw materials and supplies, enter into the closing work-in-process inventory computation. As a result of his calculations under the full cost absorption method, the respondent has determined that the petitioner's taxable income should be increased in the years 1960, 1961, 1962, and 1965. The respondent also believes that additional adjustments to the petitioner's 1960 income are required under section 481. The petitioner's argument in support of its position may be summarized as follows: 1. Since it was organized in 1943, APC for federal income tax purposes, consistently valued its work-in-process by the prime cost method without objection from the Commissioner. It is a method which clearly reflects the income of the petitioner's business. 2. As a result of the merger, the petitioner was required to follow the prime cost method pursuant to section 381(c) (5) and the proposed regulations thereunder. 3. If the prime cost method should be rejected by the Court, it should be replaced by the direct cost method and not by the full cost absorption method applied by the respondent. 4. Whatever method is used to value work-in-process in connection with the closing inventory for 1960 should also be used in connection with the opening inventory for 1960. 26 5. Section 481 does not apply on the facts of this case to adjust the petitioner's 1960 income. 1. We do not accept the petitioner's contention that its use of the prime cost method *402 was justified by the mere fact that APC had consistently used this method since 1943. Nor do we believe that this method clearly reflected the petitioner's income. We have recently held, in All- Steel Equipment, Inc., 54 T.C. 1749 (1970), that the prime cost method does not clearly reflect income and that it is erroneous to employ that method in calculating taxable income. In All-Steel, the fact that the taxpayer had used the method consistently for many years was not regarded by this Court as a sufficient reason to set aside the respondent's determination. We observed that the authorities are in agreement that the method produces a distorted computation of taxable income. See also Photo-Sonics, Inc. v. Commissioner, 357 F. 2d 656 (C.A. 9, 1966), affirming 42 T.C. 926 (1964); Dearborn Gage Co., 48 T.C. 190 (1967); Frank G. Wikstrom & Sons, Inc., 20 T.C. 359 (1953). The petitioner has not shown to our satisfaction that a different rule should apply in the instant case. We hold that the petitioner's use of the prime cost method was properly rejected by the respondent. 2. The parties devote considerable effort on brief to a discussion of whether the instant case falls within the scope *403 of section 381(c)(4) [19] or section 381(c)(5). [20] *404 Section 381(c)(4) provides that if different methods of accounting are used by an acquiring corporation and a distributor or transferor corporation, then the acquiring corporation shall use, to compute taxable income, the method prescribed in the regulations. Section 381(c)(5) provides that if different methods of taking inventory are used by an acquiring corporation and a distributor or transferor corporation, then the acquiring corporation shall use, to take inventory, the method prescribed in the regulations. The Commissioner has promulgated regulations under section 381(c)(4), but the regulations under section 381(c)(5) are only in proposed form and have never been formally adopted. The respondent, in connection with the inventory question in this case, has placed his reliance upon section 381(c)(4) "because the regulations thereunder, being in final form, have more force and effect than the proposed regulations under section 381(c)(5)." The respondent contends, however, that the latter regulations are applicable in this case as well. Despite the fact that section 381(c)(4) deals with accounting methods and section 381(c)(5) deals with inventory *405 methods, the respondent believes he can rely on section 381(c)(4) as covering the inventory issue in the instant case because it has been held that a method of valuing inventory is also a method of accounting. See Dearborn Gage Co., supra, and Fruehauf Trailer Co., 42 T.C. 83 (1965), affd. 356 F. 2d 975 (C.A. 6, 1966), certiorari denied 385 U.S. 822. See also section 1.446-1(e)(2)(ii), Income Tax Regs.
None of the authorities cited by the respondent refer specifically to section 381, which section draws a definite distinction between methods of accounting and methods of valuing inventory. Because of this statutory differentiation, we are of the view that the regulations issued under section 381(c) (4) cannot be employed in a case involving section 381(c)(5). Furthermore, the respondent's own regulations under section 381(c)(4) make it abundantly clear that - This section shall have no application to items * * * the tax treatment of which is specifically provided for in other 27 paragraphs of section 381(c). [21] *406 Even if we were to assume that the Commissioner can adopt the section 381(c)(4) regulations for purposes of section 381(c) (5), upon which we express no opinion, he has not formally taken this step, and we are unable to decide this case on a basis which assumes that he has. Since the Commissioner has not formally adopted the regulations under section 381 (c)(5), which he issued in proposed form on December 29, 1960, we also do not regard those provisions as necessarily controlling in our resolution of the issue presently before us. In any event, we do not believe that the result we reach would be different even if the regulations in question were controlling in this case. Both sets of regulations provide that the method utilized must be one which clearly reflects a taxpayer's income. See section 1.381(c)(4)-1(c)(1) and proposed section 1.381(c)(5)-1(c), Income Tax Regs. We have found nothing in the Code or regulations which would permit, in any situation, an improper method for computing inventory. A taxpayer may not use an inventory method, such as the prime cost method, which *407 does not clearly reflect income. All Steel Equipment, Inc., supra.See also sections 1.471-2(a)(2) and 1.471-3(c), Income Tax Regs.
The petitioner maintains that it was required to use the prime cost method under section 381(c)(5) and the proposed regulations thereunder. Based on these provisions, the petitioner believes that it had no choice after the merger but to use APC's prime cost method. We disagree. APC's incorrect inventory valuation method would have been rejected by this Court if no merger had taken place, and, even if we were to assume the applicability of the proposed regulations under section 381(c)(5), we do not see how the existence of the merger serves in any respect to make the prime cost method a more accurate means for calculating taxable income. 3. The petitioner rejects the full cost absorption method as an appropriate substitute for the prime cost method and recommends a third method (direct costing). This argument of the petitioner is similar to one made in the All-Steel case. There, in holding that the full cost absorption method was preferable to the prime cost method, we stated: The wording of sections 446(b) and 471 makes clear that, in matters of accounting *408 methods, the respondent is invested with broad discretion. If a taxpayer's method of accounting does not clearly reflect income, the respondent may compute income "under such method as, in * * * [his] opinion * * * does clearly reflect income."Sec. 446(b). More specifically, section 471 provides that "inventories shall be taken * * * on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income." These provisions have been a part of our tax law for many years, and they have been interpreted as imposing an extremely heavy burden of proof on taxpayers challenging the respondent's determinations - the Supreme Court has gone so far as to require a showing that such determinations are "plainly arbitrary." Lucas v. Structural Steel Co., 281 U.S. 264 (1930). See also Photo-Sonics v. Commissioner, supra; Finance & Guaranty Co. v. Commissioner, 50 F. 2d 1061 (C.A. 4, 1931), affg. 19 B.T.A. 1313 (1930); Commissioner v. Joseph E. Seagram & Sons, Inc., 394 F. 2d 738 (C.A. 2, 1968), revg. 46 T.C. 698 (1966). Thus, it appears to be a long-standing and well established *409 policy of our tax system that since we have found the petitioner's method of accounting does not clearly reflect income, we should accept the method proposed by the respondent, unless it is shown that such method is arbitrary - we are not to fashion a different method merely because it may appeal to our sense of equity. While testimony offered on behalf of the petitioner indicates that direct costing would be another method to value the petitioner's work-in-process inventory, there is no evidence in the case which shows the full cost absorption method to be unreasonable or arbitrary. Accordingly, we conclude that the respondent was not in error in applying the full cost absorption method in this case. 4. There does not appear to be any disagreement between the parties that the method employed to value closing work-in-process inventory in 1960 should also be used to value opening work-in-process 28 inventory in that year. Fruehauf Trailer Co., supra at pages 106-107. However, the respondent, in an alternative argument, contends that the full cost absorption method should not be applied to the work-in-process which the petitioner acquired from APC. This question is discussed below in *410 connection with the section 481 issue in this case. 5. Citing section 481, [22] *411 the respondent argues in his opening statement and on brief that the petitioner's 1960 income should be increased not only by amounts resulting from the change to the full cost absorption method but also by adjustments for years prior to the year of the change "to prevent amounts from being duplicated or omitted by reason of the change * * *." The respondent asserts that section 481 is applicable pursuant to the provisions of section 1.381(c)(4)-1(a)(1)(ii), Income Tax Regs. This section of the regulations is the same section, quoted earlier, which prohibits the application of the section 381(c)(4) regulations to a section 381(c)(5) situation, and it therefore cannot serve to place the instant case within the purview of section 481. Furthermore, as we observed above, we do not rely on the regulations under section 381(c)(4) as determinative of any of the issues presently before us. While it is not totally clear from his brief, the respondent appears to have conceded that if the regulations under sections 381(c) (4) and 381(c)(5) are held not to apply in this case, then section 481 is also inapplicable and no adjustments can be made thereunder. In an alternative argument, the respondent contends that section 1013 [23] and section 362 [24] *413 apply to give the petitioner APC's basis in the work-in-process inventory acquired from APC. The respondent argues that the work-in-process acquired from APC in the tax-free exchange [25] should not be valued by the full cost absorption method. Under this approach, the *412 respondent believes that the petitioner would have APC's basis in such inventory and that the basis would not be adjusted to make corrections for APC's erroneous use of the prime cost method. As a result of this carryover of basis, the respondent observes that there would be no duplication of items resulting from any change in the method of accounting. He thus sees no need for the application of section 481. [26] The petitioner does not specifically address itself on brief to this alternative argument, nor does the petitioner make any suggestion that the respondent's alternative method of calculating its inventory is unreasonable or arbitrary. The respondent's position finds support in Dearborn Gage Co., supra at pages 198-199, and in Frank G. Wikstrom & Sons, Inc., supra at pages 360-361. We note that, since this alternative argument was raised for the first time on brief and was not a basis for the original determination in the statutory notice, the burden of proving APC's basis in the work-in-process transferred to the petitioner is on the respondent. Arthur Sorin, supra; Rozelle McSpadden, supra; Sheldon Tauber, supra.After a careful scrutiny of the entire record in this case, we are satisfied 29 that the respondent *414 has satisfied that burden. Accordingly, we hold that the petitioner acquired APC's basis ($52,841.66) in the work-in-process which it acquired from APC in 1960 and that the value of such inventory is not to be adjusted under the full cost absorption method. In view of our determination on the respondent's alternative argument and his recognition that there is no need for the application of section 481, we do not determine whether the facts of this case bring it within the scope of section 481. Decisions will be entered under Rule 50. Footnotes
1. Herbert J. Korbel was one of petitioner's counsel during the trial of this case and appeared on the initial brief filed by petitioner with James A. Cuddihy, who also appeared at trial. Following the death fo Herbert J. Korbel, the reply brief for petitioner was filed by James A. Cuddihy and Gerald H. Litwin.↩
2. In 1952, Wood wrote and published with one Van Ludwig a book relating to investment casting called "Investment Casting for Engineers." Chapter 8 of this book was entitled "The Ceramic Shell Mold or Mercast Process" and dealt with casting activities at AlloyPrecision Castings Company.↩
3. At this time, Atlas owned approximately 42 percent of the outstanding stock of Mercast.↩
4. Later, in October, 1960, Maloney was of the opinion that APC had a fairly good chance to receive tax benefits from the loss carryovers, and he expressed this view to the auditors of the company and to its treasurer at that time.↩
5. At the end of 1959, the officers of APC were: Rawson L. Wood, President; William I. Matthes, Executive Vice President; William O. Sweeny, Vice President; Max F. Wendt. Vice President; Harry Matthieson, Vice Presidentarold M. Goldsmith, Controller; Victor J. Bradley, Assistant Treasurer; and Dorothy M. Stagg, Assistant Secretary.↩
6. Under the merger agreement between APC and Alloy, APC could have abandoned the merger if Manufacturing did not merge into Alloy prior to January 1, 1960.
7. The sales personnel of Manufacturing were released during 1960 because Arwood did not find them aggressive and profit oriented.↩
8. Arwood derived substantial savings from the use of the large melting units on hand at Alloy's former plant in LaVerne after the merger. These units were used to make metal for other Arwood plants at cost.
9. In press releases issued in June and September of 1960, Arwood indicated that the development of the Ceramic Shell technique occurred at the former APC plants. It was also suggested in one such release that this development occurred prior to the merger.↩
10. APC's taxable year until 1954 was the fiscal year ending on January 31. In 1954, APC properly changed its taxable year to the calendar year by reporting its Federal income tax liability for the period February 1, 1954 to December 31, 1954. 11. Assuming that the work-in-process which the petitioner acquired from APC is to be valued by the full cost absorption method, the parties are in agreement that, in the event section 481 is inapplicable in this case, the appropriate net adjustment to the petitioner's taxable income for 1960 would be an increase of $176,000. In the event that section 481 is applicable, the parties are in agreement that the petitioner's taxable income would be increased not only by $176,000, but also as follows: (a) if the adjustment were not attributable to a change in the method of accounting initiated by the petitioner, by $105,000 (representing the difference between the $227,000 of expenses excluded by APC prior to 1960 and the $122,000 portion thereof excluded prior to February 1, 1954), or (b) if the adjustment were attributable to a change in the method of accounting initiated by the petitioner, by such $227,000 (subject to section 481(b)(4) treatment).↩
12. According to expert testimony in this record, another method for valuing work-in-process inventory is the direct cost method, pursuant to which the cost of such inventory includes only direct labor expenses, direct material costs, and direct variable expenses. The same expert opinion indicates that: While this method may be appropriate, it is not regarded by the accounting profession as a more accurate means for reflecting income than the full cost absorption method.↩
13. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
14. This subsection applies to acquisitions after March 1, 1954.↩
15. See Clarksdale Rubber Co., 45 T.C. 234↩ (1965) at pages 240-241.
16. See H. Rept. No. 1337, 83d Cong., 2d Sess., p. A67; S. Rept. No. 1622, 83d Cong., 2d Sess., p. 39; and Conf. Rept. No. 2543, 83d Cong., 2d Sess., pp. 32-33.↩
17. Cf. Estate of Peter Finder, 37 T.C. 411, 423↩ (1961).
18. The respondent notes that the true prime cost method was not used by the petitioner (and by APC) because direct labor costs were not considered in valuing the work-in-process.
19. (4) Method of accounting. - The acquiring corporation shall use the method of accounting used by the distributor or transferor corporation on the date of distribution or transfer unless different methods were used by several distributor or transferor corporations or by a distributor or transferor corporation and the acquiring corporation. If different methods were used, the acquiring corporation shall use the method or combination of methods of computing taxable income adopted pursuant to regulations prescribed by the Secretary or his delegate. ↩
20. (5) Inventories. - In any case in which inventories are received by the acquiring corporation, such inventories shall be taken by such corporation (in determining its income) on the same basis on which such inventories were taken by the distributor or transferor corporation, unless different methods were used by several distributor or transferor corporations or by a distributor or transferor corporation and the acquiring coporation. If different methods were used, the acquiring corporation shall use the method or combination of emthods of taking inventory adopted pursuant to regulations prescribed by the Secretary or his delegate.
21. This provision in the regulations appears to reflect the rule that where a given situation falls within the purview of a general code section and a specific one, it is the specific section which is controlling. See Spring City Foundry Co. v. Commissioner, 292 U.S. 182↩ (1934).
22. SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING. (a) General Rule. - In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change") - (1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then (2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.
23. SEC. 1013. BASIS OF PROPERTY INCLUDED IN INVENTORY. If the property should have been included in the last inventory, the basis shall be the last inventory value thereof. ↩
24. SEC. 362. BASIS TO CORPORATIONS. * * * (b) Transfers to Corporations. - If property was acquired by a corporation in connection with a reorganization to which this part applies, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer. This subsection shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the exchange of stock or securities of the transferee (or of a corporation which is in control of the transferee) as the consideration in whole or in part for the transfer. 25. Under sections 354 and 368, a merger like the one involved in the instant case would not be a taxable event. ↩
26. It is clear that the enactment of section 481 does not preclude the respondent from taking advantage of rules available to him without regard to that section. Dearborn Gage Co., 48 T.C. 190↩ (1967) at page 201.